THE MICHIGAN TRUST COMPANY v. THE LANSING LUMBER COMPANY AND ORLANDO M. BARNES.

*Mortgage—Right of mortgagee to possession—Equity jurisdiction —Receiver.*

1. It has never been the .policy of our law to divest the mortgagor of possession until foreclosure and the expiration of the period of redemption.
2. While it is within the power of the parties to stipulate that such possession may precede foreclosure, and while in such case a court of equity may enforce specifically such an engagement, yet such power should be exercised by the court' with a full recognition of the settled policy of this State, and only in a case where the right is clearly given by the engagement of the parties.

Appeal from Ingham.    (Person, J.)    Argued October 24, 1894.    Decided December 28, 1894.

Bill for the appointment of a receiver.    Defendants appeal.    Order appointing a receiver vacated, and record remanded for further proceedings.    The facts are stated in the opinion.

*Smith, Lee & Day* and *Fletcher & Wanty*, for complainant.

*M. V. & R. A. Montgomery* and *Cahill & Ostrander,* for defendants.

MONTGOMERY, J.  The defendant the Lansing Lumber Company, being largely indebted to various creditors, and having incurred obligations to a large amount upon which the defendant Orlando M. Barnes was indorser, on the 17th of April, 1893, executed to said Orlando M. Barnes real estate and chattel mortgages covering substantially its entire property, to indemnify him and save him harmless from loss on account of his suretyship.  Following upon this, a meeting of creditors of the Lansing Lumber Company was held, and a committee appointed to investigate the affairs of the company, which committee reported that the company had assets amounting to $573,032.35, and gross liabilities of $461,163.61, upon which liabilities defendant Orlando M. Barnes was indorser to the amount of $278,395.65.  A proposition was made by the Lansing Lumber Company to its creditors submitting a scheme by which the company should execute a mortgage to a trustee, to be agreed upon, to secure its entire indebtedness, which should be accompanied by coupon bonds collateral to the mortgage, bearing interest at 6 per cent., payable semi-annually, on the 1st day of May and the 1st day of November of each year; said bonds to be issued to the holders of the obligations of the company then outstanding, in lieu of existing evidences of indebtedness, the bonds to consist of two series, and be known as A bonds and B bonds, the A bonds having priority, and to be issued in lieu of the securities upon which Orlando M. Barnes was an indorser, he at the time agreeing to enter into an agreement continuing his guaranty upon such securities. The proposition contained the following further provisions:

"Said trustee shall be empowered, upon the failure of said company to provide sufficient means during any half

year to pay the interest due at the end thereof, at the request of a majority in interest of all the creditors secured thereby, to declare said. mortgage due and payable at once, and proceed to foreclose the same. Said trustee may, at his option, at any time when the company is in default in the payment of interest or principal, or if he finds that the business of the company is being conducted at a loss, or is not being economically conducted, take possession of all the property, real and personal, of said company, and its entire business, and conduct the same in the ordinary way for the benefit of the parties in interest, until the principal and interest of said bonds are paid, or until the holders of a majority in amount of the bonds secured by said mortgage require him to foreclose the same."

This proposition was acted upon by the creditors, and resulted in the execution by the Lansing Lumber Company of a trust deed to the complainant, which covered the entire property of the Lansing Lumber Company, real and personal, and was given to secure the bonds of the A and B issue contemplated in the proposition, and which trust deed contained the following provisions, which are those only which we deem material as bearing upon the questions which we are called upon to consider:

The conveyance was stated to be "in trust for the uses and purposes hereinafter mentioned; that is to say, that if the interest on any of the bonds so to be issued shall not be paid by the party of the first part when the same shall become due, and if such interest shall remain in arrear for one month, then it shall be lawful for the said party of the second part and its successor or successors in the trust to take possession of all and singular the said premises, property, and franchises so conveyed, and as the attorney or agent of the said party of the first part, by its agents or substitutes duly constituted, to have, use, enjoy, and operate and manage the same, making from time to time all needful repairs, alterations, and additions, and, after deducting the expense of such use, repairs, alterations, and additions, to apply the proceeds thereof to the payment of the principal and interest of said bonds issued hereunder, remaining unpaid, in the order herein

provided; and upon the written request of the holders of
at least one-half in amount of said bonds issued hereunder,
and then outstanding and unpaid,   *   *   *   shall
cause the said premises, real and personal estate, rights.
and franchises, to be sold at public auction," etc.

The trust deed contained the further provisions, defining
the powers of the trustee, as follows:

" Said trustee shall have power, upon the failure of said
company to provide sufficient means during any half year
to pay the interest due at the end thereof, or within one
month thereafter, at the request of a majority in interest
of all the creditors secured hereby, to declare this mort--
gage due and payable at once, and proceed to foreclose
the same.

" Said trustee, if at any time the business of said com-
pany is not profitable, or if the management thereof by
the company is so wanting in economy, in the judgment.
of the trustee, as to endanger the security of the bond-
holders, may, if a majority in interest of said bondholders.
shall so request in writing, take possession of all the prop--
erty, real and personal, of said company, and its entire
business, and conduct the same in the ordinary way for
the benefit of the parties in interest, paying the net in-
come of said business, after the taxes upon the property,.
the insurance, and expenses are paid, upon said bonds,.
until the principal and interest of said bonds are paid;
or, upon taking possession as herein provided, if a major-
ity in interest of the bondholders shall so request in writ-
ing, said trustee shall proceed to foreclose this mortgage.""

On the 10th of March, 1894, a fire occurred which con--
sumed the saw and shingle mills and all the lumber, lath,
and shingles belonging to the company, at Dodge, which
was the place where the principal manufacturing of the
company was done, entailing a very heavy loss.   On the
4th of May, 1894, a meeting of the creditors was held, at,
which a report of the trustee was submitted, which con-
tained the following:

" In accordance with this provision of the deed, we have
kept ourselves informed in a general way as to the busi-
ness methods of the company, and have from time to time.

made such suggestions in regard to the management of their affairs as to us seemed proper. These suggestions have always been well received by the members of the company, and generally they have acted in accordance with them.

"We have checked up the books, from the date of our appointment to December 15, 1893, the end of the fiscal year, and find their receipts and disbursements are proper and correct.

"We present for your consideration a balance sheet of the company, which shows you the face of their books on the 15th of December, with only such changes in them as would occur in the ordinary conduct of the business, from the figures which the committee found there upon their examination in May, 1893. We have prepared a profit and loss account in such a manner as to show you the result of the business for the current year, without charging off any items which did not properly belong to the business of the year. The result shows a gain in the Lansing or retail department of $4,122.65, and a loss in the Dodge or wholesale department of $10,988.86,—a net loss on the year's business of $6,866.21. We are frank to say that we are not very much surprised at this result, owing to the fact that during the first half year the company was struggling with an enormous indebtedness, all of which was pressing them, and, after the trust deed was executed, a large amount of time was required on the part of the management in the settlement of their indebtedness, necessary to the issuance of the bonds, and this extra work naturally left the business without the care that had usually been given it; and, again, the financial depression which began in May continued and grew steadily worse during the year, and it is something of a surprise to us that, under all the circumstances, they were able to keep the mill at Dodge and the shop at Lansing in operation."

The report further proceeded to show that the expense of manufacturing the hemlock, including the estimated stumpage of $1 per thousand feet, was $9.54, while the average selling price of the hemlock lumber was estimated at $8.38; and the report proceeds:

"It must be apparent to every creditor, from the figures given you, that it will be utterly impossible for the Lansing Lumber Company to ever pay its indebtedness out of

the assets and profits of their business; for, while it is probable that a material reduction can be made in the cost of their lumbering operations, the standing timber, being hemlock, naturally yields but a small average return, so that even with a good lumber market, such as we had in 1892, the profit, if any, would be very small."

The report further states:

"It must also be apparent to you that a business of this magnitude cannot be managed successfully and profitably without credit and without money, and there are no provisions in the trust deed which would enable the trustee to borrow or to advance any sum to the company for the general conduct of its business, for which there would be security; and we are satisfied that they cannot, from the receipts of the business, accumulate a working capital."

The creditors adopted the following resolution:

"*Whereas*, the Michigan Trust Company, trustee under a certain mortgage or trust deed, dated the 1st day of May, 1893, made and executed by the Lansing Lumber Company, * * * has reported to the holders of bonds under said mortgage and the creditors of said Lansing Lumber Company holding interests under said mortgage or trust deed, at a meeting of said creditors called by said trustee, and held in the city of Grand Rapids on the 4th day of May, 1894, that, in the judgment of said trustee, the business of said company is not profitable:

"Now, therefore, we, the undersigned, a majority in interest of the bondholders under said mortgage or trust deed, hereby request the said trustee, the Michigan Trust Company, to take possession of all the property, real and personal, of said company, and its entire business, and proceed to the foreclosure of said mortgage or trust deed; any and all of us, however, reserving the right hereby and herein to apply to any court of competent jurisdiction for the appointment of a receiver in the foreclosure of said mortgage or trust deed."

The trustee thereupon demanded possession of the property, which was refused by the defendant company. Complainant thereupon filed this bill, asking a specific performance of the contract, and for the appointment of a receiver *pendente lite;* the theory of the complainant being

that the defendant has contracted and agreed that, upon the happening of certain contingencies, the complainant, as trustee, shall succeed to the management and control of all the business and affairs of the corporation. The contingencies named are: *First*, if the interest on any of the bonds shall remain in arrear for one month; *second*, if the business of the company is not profitable; or, *third*, if the management of the business is so wanting in economy, in the judgment of the trustee, as to endanger the security of the bondholders, and if the majority in interest of the bondholders shall so request in writing. The bill alleges that each of these contingencies has arisen.

A fire occurred March 10, 1894, consuming the entire plant at Dodge, consisting of mills, lumber product, etc.; and insurance money came into the hands of complainant on account of lumber products amounting to $52,218.85. The policies of insurance were made payable to complainant, trustee, as its interest might appear. The bill alleges that the holders of prior liens claim the insurance money, and that the holders of bonds claim that such moneys should not be so disbursed unless it be necessary to protect the security under the trust deed.

It will be noted that the provision that the trustee may take possession of the business "if the management thereof by the company is so wanting in economy, in the judgment of the trustee, as to endanger the security," is limited by the proviso that a majority in interest of the bondholders so request in writing. The only request made by the creditors, as appears by the bill, was based upon the claim that the business was unprofitable; and hence this question and that of whether, within the meaning of the trust deed, the company was in default in paying the interest, are the two grounds to be considered.

It is true that the interest was not paid, but it is averred in the answer that the casualty of the fire is a reason for

this, and that the insurance money which came into the hands of the trustee was received on account of the loss of the lumber and material which could have been, but for such misfortune, applied to the payment of interest. The complainant insists that the letter of the trust deed required that the interest should be paid as it fell due, and that, furthermore, it was fairly inferable from the terms of the statement that such interest was to be paid out of the profits. It is, doubtless, true that none of the parties to the instrument contemplated any such catastrophe as befell the company, nor was the instrument drawn with any such possibility in view. Other provisions were made to guard against mismanagement, and against unprofitable prosecution of the business; but we cannot say that there should be read into the instrument a provision that these interest moneys should be paid from the profits alone where unexpected loss has made it necessary either to yield possession or pay the interest from the funds.

Is the business shown by the provisions of the bill and answer to have been unprofitable, within the meaning of the trust deed? The bill avers that,—

"In the judgment of your orator, and as a matter of fact, the business of said company as a whole, as now conducted, is not profitable, and your orator avers that said Lansing Lumber Company has paid nothing upon the principal of its indebtedness since the execution of said deed of trust."

The answer denies that the business of said company as a whole, as now conducted, is not profitable. The averment of the bill is based upon the inventory taken on the 15th of December, 1893, which upon its face shows a net loss on the year's business of $6,866.21. The answer accounts for this showing by averring that—

"From December 15, 1892, until the creditors of this company were called together, the company was making extraordinary endeavors to pay its indebtedness and to

maintain its credit;" that "the rates of interest charged
the company were not the most favorable. In its attempt
to fund its debt, and to secure the same by mortgage upon
its property, extraordinary expenses were incurred. The
bills for printing, for attorneys' fees, for the costs of the
committee appointed by the creditors, for traveling expenses
of officers of the company, and the thousand and one other
items of expense occasioned by the funding of the debt,
and the arrangement with creditors, were all charged as
expenses for the business of the year ending December 15,
1893. It is estimated on behalf of the defendant that
these extraordinary expenses were not less than the sum
of $8,000, and are believed to amount to nearly $10,000,
although it is impossible now to separate from other
items the particular items of expense occasioned by the
funding of the debt. But defendant has caused to be pre-
pared, and attaches to this its answer, a statement showing
some of the more important items of expense incurred in
this behalf."

This statement shows a total of $4,761.25. It is also
set out in the answer that, at about the time the trust
deed was given, the insurance upon the property at Lan-
sing and Dodge was canceled, and was again procured by
considerable effort; that it was renewed about July, 1893,
for one year, and the total amount paid for premiums
was about the sum of $5,300. This was all charged off in
making the inventory of 1893, although it paid for
insurance to July, 1894. The answer also sets out that
the statement of complainant is based upon the inventory
of December 15, 1892, and that the estimate of logs on
hand was too great by 2,000,000 feet. We should not be
disposed to regard this statement, however, without a more
complete and full showing, as fairly meeting the averments
of the bill, if our conclusion were to be rested on it.
But the answer contains a further averment that the
inventory of lumber taken December 15, 1893, was at 50
cents per 1,000 less than the inventory of December, 1892,
the difference between the two items being estimated at
$3,000, and that no piece of property which appears in

both inventories was inventoried higher in 1893 than in 1892.

The answer, if taken as true, or fairly weighed as evidence, shows, as we think, that the business of the company was not being conducted in an unprofitable manner. If it be accepted as true that the lumber was inventoried at 50 cents per 1,000 less than in 1892, making a difference of $3,000, this shows either a disposition to make a more conservative estimate, or that the material has depreciated, but does not show a loss from operation which could be remedied by a change in management, which is unquestionably the nature of unprofitableness which is guarded against by the agreement. It is also evident that only that portion of the insurance money which was paid as premiums for insurance during the fiscal year ending December 15, 1893, should be charged to expense for that year. If to these items be added the extraordinary expenses incident to refunding the indebtedness which are shown in the itemized figures alone (and excluding all others which are not thus accounted for), which expenses cannot be treated as a running expense, we have a total of $10,411.25, and the business will thus show a profit during the fiscal year ending December 15, 1893, of something more than $3,500. We see no reason to doubt the substantial accuracy of these figures.

We have not considered the charge of want of economy, as we do not think complainant has shown the prerequisite conditions. If, as alleged in the bill, excessive salaries are being paid, or the management is wanting in economy in other respects, the remedy under the trust deed is still available to the creditors.

It cannot be doubted that the parties, if all were acting in good faith, contemplated that the management of the business of the concern should be left in the officers of

the corporation until the contingencies, or some one of them, arose, which would give to the trustee the right under the terms of the agreement to demand possession. It has never been the policy of our law to divest the mortgagor of possession until foreclosure and the expiration of the period of redemption; and while we think it within the power of the parties to stipulate that such possession and management of the business may precede foreclosure, and that in such case a court of equity may enforce specifically such an engagement, as was held by the court below, and as we think is sustained by the authorities (*Shepley v. Railroad Co.*, 55 Me. 395; *Shaw v. Railroad Co.*, 5 Gray, 162; *Railroad Co. v. Superior Court of San Francisco*, 55 Cal. 453; *McLane v. Railroad Co.*, 66 Id. 606; *Rice v. Railroad Co.*, 24 Minn. 464), yet such power should be exercised with a full recognition of the settled policy of this State, and should not be exercised except in a case where the right is clearly given by the engagement of the party.    See *Beecher v. Rolling Mill Co.*, 40 Mich. 307.

We think the order appointing a receiver should be vacated, and the cause remanded for further proceedings.

The other Justices concurred.