## MOSHER v. LANSING LUMBER CO.

1. TRUSTS AND TRUSTEES—CONTRACTS—CONSIDERATION.

Complainants sold certain standing timber to a lumber company under a contract which provided that the title to all logs, timber, and lumber should remain in the vendors until full payment of the purchase price. While a large amount remained due, the purchaser became financially embarrassed, and executed a trust deed of all of its assets for the benefit of creditors. By the terms of the deed, the trustee was authorized to pay up the land contract, and to advance or borrow moneys for this purpose. Complainants wrote several letters to the trustee, urging payment of their claim, stating that the same was secured by land contracts covering, not only the standing timber, but the logs and lumber as well, and declaring that, unless the matter should be taken up at once, they would be obliged to protect themselves by due process of law. In reply the trustee assured them that he had their claim in mind, and hoped, in a reasonable time, to pay them something thereon, urged them to let the matter rest quietly, and suggested that, their security being perfectly good, it would be unjustifiable for them to take the measures threatened. Held, that this amounted to a promise to pay complainants' claim if they would forbear taking possession of the property, for which promise the forbearance of the complainants constituted a sufficient consideration.

2. SAME—INSURANCE—EQUITABLE LIENS.

The property having been destroyed by fire, payment of the claim was compelled from the proceeds of insurance effected in the name of the trustee.

HOOKER and GRANT, JJ., dissenting.

3. CONDITIONAL SALE—INSURANCE—RIGHTS OF VENDOR.

Under a contract of sale reserving title in the vendor until payment of the purchase price, and authorizing him to insure the property, and charge the cost to the vendee, the vendor has no equitable claim upon the proceeds of insurance procured by the vendee to protect his own interest, even though the vendee had upon several occasions, at the request of the vendor, obtained insurance for the latter's benefit, and forwarded the policies to him. Per HOOKER and GRANT, JJ.

Appeal from Clare; Dodds, J. Submitted November 19, 1895. Original opinion December 30, 1895. Rehearing granted July 21, 1896. Reargued November 18, 1896. Final opinions May 11, 1897.

Bill by Alfred Mosher and Spencer O. Fisher against the Lansing Lumber Company and the Michigan Trust Company, to compel the latter company, as trustee, to apply the proceeds of certain insurance policies to the payment of an amount due complainants from the Lansing Lumber Company under certain land contracts, and to foreclose said contracts. From a decree for complainants, defendant the Michigan Trust Company appeals. Affirmed.

The complainants in this case owned in fee the descriptions of land set forth in the bill of complaint. On the 21st day of November, 1887, complainants entered into a contract with O. M. Barnes and W. H. Dodge to sell to the latter parties certain lands in the county of Clare. On the 2d day of July, 1888, this contract was assigned by Barnes and Dodge to the Lansing Lumber Company, a corporation, one of the defendants. On the 5th of December, 1888, complainants entered into another contract with the Lansing Lumber Company to sell it other lands in the said county. By the terms of each of the said contracts, the second parties were not permitted "to cut or carry away from the lands any timber, wood, or other material, without the consent, in writing, of complainants being first had and obtained therefor; and, in case of any such wrongful cutting, second parties shall be considered as trespassers."

The Lansing Lumber Company, being unable to cut timber off the land under these contracts, about the 24th day of September, 1890, entered into a third written contract with the complainants, whereby it was provided that the Lansing Lumber Company might cut and manu-

facture the timber from these lands into lumber, and mark the logs and lumber with complainants' mark, and that—

"The entire title, ownership, and right of possession in and to all logs, timber, and lumber manufactured from the said lands shall be and remain in complainants until the full payment of all moneys due or to become due on either or both contracts, and the notes executed in connection therewith, or any notes executed in renewal of such notes, are paid."

"Said first parties may insure same in their own names, or otherwise, as they may deem advisable, and said second parties shall pay the expense thereof; and in case second party shall fail to pay for such insurance, and first party shall pay the same, second parties shall pay to first parties such cost and expense of insurance, together with interest thereon at the rate of 7 per cent. per annum, which amount shall be added to the sums to become due and payable under this contract, and be considered as a part thereof."

All the logs and lumber then cut were marked with the marking iron of the complainants, as provided, and all logs and lumber thereafter cut were so marked. After the making of this contract, insurance held by the Lansing Lumber Company on the lumber cut and piled at the mill, to the amount of $60,000, was indorsed, "Loss, if any, payable to the complainants," which insurance was kept renewed; but such renewals, after the second year, were not made payable to the complainants. In May, 1893, the Lansing Lumber Company executed to defendant the Michigan Trust Company a deed of trust for the benefit of the creditors of the Lansing Lumber Company, dated May 1st, but executed later. The trustee was authorized "to advance or borrow money to pay up these and other land contracts, and perfect the title to the land so held." The trust deed also contained a further provision for the payment of these land contracts out of moneys received by the trustee, "before applying any to the payment of the bonds issued with the trust deed." After giving the trust deed, the Lansing Lumber Company continued to carry on the business under the provisions of

the trust deed, and effected insurance on all the logs and lumber of the Lansing Lumber Company, payable to the Michigan Trust Company as trustee. There was due complainants, at the time of giving the said trust deed, about $12,000 upon said contracts, which, with the interest, is the indebtedness upon said contracts for which this suit is brought. On or about the 10th of March, 1894, the mill in which the lumber was manufactured, together with the lumber in the yard, including the lumber the title of which was in complainants, was consumed by fire, and the Michigan Trust Company was paid by the insurance companies insurance thereon to the amount of $60,000. This suit is to foreclose the said contracts, and to have the amount due thereon paid by the trustee out of the moneys received on the insurance policies that cover complainants' lumber. Decree was rendered for complainants.

*T. F. Shepard* and *M. V. Montgomery*, for complainants.

*Fletcher & Wanty*, for appellant.

GRANT, J. (*after stating the facts*). This case is ruled by *First Nat. Bank of Ionia* v. *Michigan Trust Co.*, 105 Mich. 107, unless the provisions of contract No. 3 bring the complainants without it. Neither the trust company nor any of the creditors of the Lansing Lumber Company had knowledge of the existence of this contract at the time the compromise was effected between that company and its creditors which resulted in the execution of the trust deed, nor did either know of its existence until after the fire. A committee of creditors was appointed to examine into the affairs, and report upon the assets and liabilities, of the company. They went to Dodge, the place where the mill plant and the lumber and logs were situated, and reported to the creditors. Among the assets so reported was an item of lumber amounting to $43,533, and logs amounting to $71,864.55, in which were included the lumber and logs in contro-

versy. The committee for the creditors, as well as the creditors themselves, made this settlement upon the basis that the lumber and logs in the mill yard and boom at Dodge were the property of the lumber company. The complainants stood by, knowing the situation, and made no claim to it, and did not inform the committee or any of the creditors of the existence of contract No. 3. The trust company obtained insurance upon this property as its own, and without any knowledge of that contract. After the property was destroyed, Mr. Fisher said to Mr. Withey, the president of the trust company:

"I sat by, and let the Lansing Lumber Company make this mortgage, and never said a word about my claim, because I always had a high regard for Mr. O. M. Barnes, and did not want to do anything that would stand in his way."

Mr. Barnes was largely interested in that company. Complainants cannot therefore be now permitted to set up this contract as creating a lien upon the insurance money, as against other creditors. This is not the case of the ordinary assignee, who acquires no greater rights than his assignor. The trust deed was a compromise between the company and the creditors, made by the latter without knowledge of the complainants' claim, and in reliance upon this property as constituting a part of the assets, and for a good consideration.

Decree reversed and bill dismissed, with costs of both courts.

The other Justices concurred.

### ON REHEARING.

HOOKER, J. The Lansing Lumber Company, a corporation engaged in the manufacture of lumber, being unable to meet its obligations, in May, 1893, made a trust deed of its property to the Michigan Trust Company for the benefit of its creditors, the provisions of which need not be stated. See *First Nat. Bank of Ionia* v. *Michigan Trust Co.*, 105 Mich. 107. A part of the property

included in the trust deed was logs and lumber at the sawmill of the grantor, at Dodge, Mich., a portion of which was cut from lands held by the Lansing Lumber Company under two land contracts in which the complainants were vendors, and which forbade the cutting of timber. Much cutting was done without authority, and further cutting was permitted under a subsequent contract between the complainants and the Lansing Lumber Company, which provided that the title to all logs which had been or might thereafter be cut, and to lumber made or to be made from logs taken from said lands, should remain the property of complainants until the land should be fully paid for, and which also contained the provision that—

"The first parties [i. e., the complainants] may insure same in their own names, or otherwise, as they may deem advisable, and second parties shall pay the expense thereof; and in case second party shall fail to pay for such insurance, and first party shall pay the same, second parties shall pay to first parties such cost and expense of insurance, together with interest thereon at the rate of 7 per cent. per annum, which amount shall be added to the sums to become due and payable under this contract, and be considered as a part thereof."

This contract was executed on September 24, 1890. The Lansing Lumber Company manufactured the logs into lumber, which was destroyed by fire, with other lumber and the sawmill, on the 10th day of March, 1894, after it had come into possession of the Michigan Trust Company. At this time there was insurance upon the mills and lumber to the amount of nearly $70,000, of which about $62,000 was collected by the Michigan Trust Company. Of the amount collected about $52,000 or $53,000 was paid for loss upon the lumber. At the time of the fire there was due to the complainants upon these contracts about $12,000, and they asked the Michigan Trust Company that they be paid from the amount received for insurance, and the decree of the circuit court practically so ordered, from which the defendants have appealed.

The record shows that after the contract of September 24, 1890, was made, the complainants requested the Lansing Lumber Company to send the insurance policies. At that time the Lansing Lumber Company had insurance, procured in June previous, and, after obtaining an indorsement that the loss, if any, should be made payable to the complainants as their interest should appear, it forwarded policies to the amount of $65,000 to the complainants. In June, 1891, this insurance was renewed, but the policies were held by the Lansing Lumber Company until December 11, 1891, when complainants wrote that, in looking over the matter, they found their insurance had expired, and asked that it be renewed. Mr. Renyx, the secretary of the lumber company, wrote that they were properly made out and filed in the office of the lumber company, and Mr. Fisher, one of the complainants, wrote back, asking that the policies be sent to him, which was done to the amount of $37,250. From that time until after the fire no further request for or inquiry about insurance was made by complainants. These policies expired in June, 1892, and at a later time policies were issued to O. F. Barnes, as trustee, and subsequently to the Michigan Trust Company, no mention of complainants being made in either instance. The testimony shows that the fire destroyed about 1,000,000 feet of pine, worth $14 per M. feet, and 7,000,000 feet of other lumber, worth from $9 to $10 per M. feet, about half of which came from the lands bought of the complainants. The Michigan Trust Company claims that it was not aware that complainants had title to any of this lumber, but, however that may have been, it seems clear that it had never seen the contract providing for insurance, or had any information that complainants ever had insurance, or claimed that they were entitled to any; and apparently it procured insurance to protect itself and the creditors whose bonds were secured by the property, in the usual and prudent course of business.

Where a mortgage contains a covenant that the mort-

gagor will keep the premises insured for the benefit of the mortgagee, and does not, equity will compel the former to pay over moneys collected upon policies payable to himself. And this court has held that—

"Where C. agreed to give M. a mortgage upon a dwelling, and to insure it for the benefit of the mortgagee, in consideration that M. should become C.'s surety on a note, which arrangement was carried out by the execution of the papers, and the procurement of the insurance as promised, a surrender of the policy by C., without M.'s knowledge or consent, and the issue of a new policy to A., who took with notice upon his purchase of the property, was collusive and fraudulent, and relief was afforded upon the ground that, while C. may have had a legal right to surrender the policy taken out for M.'s protection, he had no equitable right to do so; and, as A. knew all the facts, and took his new policy on a wrongful surrender of one which protected M., and for a sum which precluded M. from insuring in his own behalf, M. had an equitable interest in the new policy to the extent of his lien, whether A. did or did not expressly agree with C. that such should be the case, as C. testified that he did." *Miller* v. *Aldrich*, 31 Mich. 412, and cases cited in note on page 408.

But, as there said:

"If there is no covenant or agreement in the mortgage that the premises shall be insured for the benefit of the mortgagee, and no verbal agreement to that effect, which has once been acted upon as in the principal case, the mere fact that the mortgage covers the property insured, and that the insured is personally liable for the debt, gives the mortgagee no claim upon the policy, or upon the proceeds thereof in case of loss." Id.

The letter of the contract did not require the Lansing Lumber Company to keep the property insured, nor did it fix the amount of insurance to be carried. It merely gave the complainants the right to insure at the expense of the Lansing Lumber Company. Under this provision they might insure or not, and the cost of procuring an amount reasonably adequate for their protection might be charged to the Lansing Lumber Company. If there

were nothing in the nature of a contract with regard to insurance between the parties, the complainants would have no standing here, unless upon the broad proposition that, as owners of the title to the property, they should have a right to such insurance as the vendee might effect and collect upon it, or sufficient to pay their claim, or at least make it good after the application of the land thereto. We know of no authority that would support the proposition that mere ownership of the legal title gives the exclusive right to insure, or the right to collect insurance procured upon the property by others, especially where such others have equitable interests which they may find underwriters willing to insure.

It is a common practice for music dealers and others to sell instruments and machines upon installments, reserving title in the vendor until full payment. In such cases we have supposed that the vendor has no concern with, or claim upon, any insurance that the purchaser may procure to protect himself upon his interest arising out of the payments made. The vendor would have to be satisfied with the security afforded by his contract, viz.: *First*, the obligation of the purchaser to pay the price; *second*, the retention of title as security for payment; and, if the contract should provide that the vendor might procure insurance at the expense of the purchaser, in the name of one or the other, the fact that upon request the purchaser procured and sent him policies on two occasions would hardly relieve the vendor from looking after the insurance and requesting policies thereafter, if he desired them, and make it incumbent upon the purchaser to provide insurance, and see that it was kept up, at the peril of having the insurance procured for his own protection appropriated to the payment of the claim, through the establishment of an equitable lien. We see no equity in holding in such a case that the vendor of the piano should be relieved, and the loss allowed to fall upon the vendee, when due to the neglect or disinclination of the vendor to avail himself of his right under the con-

tract. We have seen no case that has gone to that extent. It is not the province of courts to make or enlarge contracts. Such case would seem to be upon all fours with this in all substantial particulars involved in the discussion of this question. We are therefore of the opinion that, had this question arisen between the original parties, the complainants could not sustain their claims to the insurance on the basis of a covenant. But force is added to this by the fact that the Michigan Trust Company is the assignee of the Lansing Lumber Company's interest, not as an assignee for the benefit of creditors in the ordinary sense, but as the representative of the creditors who have taken Lansing Lumber Company bonds, as collateral security for which it holds this title. It and the creditors took the title in ignorance of this contract to pay for insurance, giving, as consideration for the same, an extension of time, and release of an indorser upon the lumber company paper held by such creditors respectively; and, if it be said that they took it subject to the contract obligations, it was under circumstances which do not justify anything in the nature of an enlargement of such obligations. If the Michigan Trust Company had not insured the lumber, and the entire stock was therefore a total loss, could the complainants ask that its loss be made good? If the trust company was under obligation to see that insurance was provided for complainants' benefit, it would seem to follow that an action would lie for the failure, and that the amount of the claim would be the measure of damages. If, on the other hand, it could escape such liability on the ground that the contract did not require it to do more than to pay for such insurance as the complainants saw fit to procure, how is the situation changed by the fact that it had insured the property for its own benefit? But there is nothing in the trust deed that imposes the burden upon the Michigan Trust Company to see that the property was insured.

It has been suggested herein that the terms of the trust

deed need not be referred to, but in one view it may be
well to look at the situation of the parties. The trustee
took this deed by way of security, and it has been treated
and adjudicated upon as a mortgage. See *Michigan
Trust Co.* v. *Lansing Lumber Co.*, 103 Mich. 392. By
its express terms it contemplated that the Lansing Lum-
ber Company should retain possession until default. The
trust deed contemplated that the lumber company might,
by continuing business with the mortgaged property, be
able to pay its debts, in which case the trust deed would
be satisfied, and it is apparent that until default the trust
company had no right to interfere with the property, or
to take it into possession; and, after the fire had destroyed
the property, this court held that the lumber company had
not defaulted, and that the trust company was not entitled
to the possession. But said trust deed did empower the
trust company to make payment upon property held
under land contracts from funds in its hands, and it was
authorized to borrow money for the purpose, with a view
to preserving its security, if necessary, which power was
construed in *First Nat. Bank of Ionia* v. *Michigan
Trust Co.*, 105 Mich. 107; and it may be contended that
said company agreed to pay this claim of Mosher and
Fisher in consideration of forbearance. If this is true, it
is not because of the fact that the trust company insured
its interest, and the agreement must have been such that,
if it had not insured the property, it would still have
created an obligation upon the trustee to pay the claim,
to the exclusion of all other creditors, and whether it ever
realized a dollar from the Lansing Lumber Company's prop-
erty or not; and the remedy would have been at law. The
bill seems not to have been framed on such a theory; but,
if it be conceded that such a contract would have been
within the authority given by the deed, it must still appear
that it has made such a contract. If such contract has
been made, it was by virtue of the correspondence between
Mosher and Fisher and Mr. Withey. The first letter of the
series was one which was written to Mr. O. M. Barnes,

by Mosher and Fisher, and which is not before us. We may suppose it urged payment, and threatened seizure of the lumber, as subsequent letters did. The first letter written by the trustee was in answer to this, and it said that it did not understand that the land contracts covered not only standing timber, but the logs and lumber on hand. It stated further that it had been busy, and had not gone into the details in relation to the various claims, but would give the matter immediate attention. It concluded as follows:

"The condition of the money market at the present time is such that no one is warranted in being very impatient over delays in collections, and so long as parties have ample security we do not think there would be any justification in taking so severe measures as you suggest, and we trust that you will treat the Lansing Lumber Company with such leniency as the times will seem to warrant."

The next letter was addressed to the Michigan Trust Company, and insisted on payment, to which the following reply was made:

"*Gentlemen:* Replying to yours of the 3d inst., would say that we have not the slightest doubt but that the Lansing Lumber Company would have been able to have made good their assurances to you had not the general panic and hard times overtaken the country, but all promises which were made in those days are declared off now by every one, and they are no exception to the rule. At that time they were doing a fine business, but at the present time they are not able to collect money enough to meet their pay rolls, and have been seriously considering the proposition of closing down the mill at Dodge City; hence you will see that it is utterly impossible for them to comply with your request; and, as they cannot borrow any money, we see no other way than that you will have to be patient until the present stringency eases off. Your security is perfectly good, and that is a good deal more than most creditors have in these days; so we shall expect that you will be patient, and not press payment of the matter at the present time."

In another letter, written September 28th, Mr. Withey uses this language:

"*Gentlemen:*   In reply to your favor of the 25th inst., would say that we do not see how the Lansing Lumber Company are going to be able to make you any considerable payment on your claim right away, as during the months of July and August they were not able to sell anything, and consequently two months of the very best of the season were dropped out of their business, and the money which they otherwise would have had at this time is invested in lumber.   It is unnecessary for us to explain to you the reasons, because every business man can understand just how the panic has affected us all.   We think that the affairs of the Lansing Lumber Company are brightening up very much, and hope, in a reasonable time, to be able to pay you something on your claim. We will call the attention of the people at Lansing to your matter, and ask them to do something for you as soon as they can."

And again he wrote December 2d:

"*Dear Sir:*   Replying to your esteemed favor of the 29th ult., would say that, since money matters eased up, the Lansing Lumber Company have been doing considerably better.   They have been able to meet the interest on their bonds which matured on November 1st, and now propose to take care of such matters as yours just as rapidly as possible.   They have considerable amounts due them from two parties who have been unable up to the present time to pay them, but they are expecting to get it in almost any time, and when they do these funds can be applied on your matter."

This correspondence showed a willingness that this claim should be paid from funds expected to come into the hands of the lumber company.   Mosher and Fisher, and possibly Barnes, seem to have labored under the impression that by bringing a pressure upon the trustee the payment of the claim could be hurried, and Mr. Withey apparently excused the delay of the lumber company, and expressed his opinion as to its ability to pay, and sources from which it might receive money which it could

112 MICH.—34.

apply to the purpose. The letters do not indicate an intention to assume such payment. On the contrary, that of August 5th expressly alludes to the impossibility of payment by the lumber company; that of September 28th says he will ask the lumber company to pay; and the last —that of December 2d—says that the lumber company (not the Michigan Trust Company) "is expecting money, which, when received, can be applied upon the matter." This is the extent of anything in the nature of a promise by the Michigan Trust Company, and, in our opinion, was not such a promise to pay as fastened a liability upon it.

Again, what was the consideration for such promise? There is nothing to show that Mosher and Fisher agreed to extend the time for payment. They did not surrender any security on the strength of a promise. They merely waited, and did not at once enforce their lien. It was like any other case of clemency. It seems clear that, if the property were not destroyed, Mosher and Fisher could not sue and recover against the Michigan Trust Company upon this contract, but would be compelled to look to their security; and, if so, it is not different because of the destruction of the lumber. We think it patent that neither party understood that such a contract was made, and the contention, if made, would be likely to find its chief support in a real or imaginary equity, arising out of the fact that through clemency, and accident which they could not foresee, Mosher and Fisher were placed in a position where loss must fall upon them unless the trust company, which may be said to have desired to have the contract performed, can be made to bear the burden. The Lansing Lumber Company, too, has suffered a loss, and is still under obligation to pay the claim. The lands are still holden for this debt, and it is not clear to us that the creditors, who have not received this property, or (as we have shown) sufficient insurance to cover it, should be equitably chargeable with the loss.

It is suggested on behalf of the complainants that they have lost their security, and that the Michigan Trust Company has the value—practically the proceeds—thereof, but is this so? As stated, the lumber is shown to have been worth from $77,000 to $84,000. The sum of $53,000 in round numbers has been received from it, leaving from $24,000 to $31,000 loss. On the basis of $77,000, the complainants had, equitably, an interest of $12,000, and the defendants $65,000. It will therefore be seen that the defendants, having received only $53,000 of the $65,-000 interest, must, in any event, lose at least $12,000, and as much more as complainants shall be able to collect from the lands covered by the contracts, and from their distributive share of the property covered by the trust deed, if they are secured thereby,—a question not before us, and upon which we have no knowledge or opinion. It seems to us, therefore, that it cannot be said that the defendants have the proceeds of the complainants' property in an equitable sense. We are driven to the conclusion that the complainants' security has been destroyed and lost to them through unavoidable accident, and that they have not superior equities in the fund arising from the insurance by the trustee of its interest.

The decree of the circuit court determined the amount due to the complainants from the Lansing Lumber Company to be $13,709.60, with interest at 7 per cent. from the 5th day of June, 1895, and awarded execution against the Michigan Trust Company therefor. We understand that the amount of the obligation is not disputed, and we are of the opinion that the amount found by the circuit court to be due from the Lansing Lumber Company was correct, and the decree should be so far affirmed, but that in so far as it declares the Michigan Trust Company to be liable therefor it was erroneous, and should be reversed; any intention to determine complainants' rights to a distributive share under the trust deed being hereby disavowed. The complainants are entitled to a decree authorizing, in default of payment of the amount herein

decreed within 30 days after notice of the decree, the sale, as in case of foreclosure, of the lands described in said bill, or so much thereof as may be necessary to the payment of the amount of said debt and interest, and costs of the circuit court, less the costs of the defendants in this court to be taxed; and that, in the event of the payment of said sum by the defendants, or either of them, the complainants should forthwith execute and deliver to the Michigan Trust Company a proper and sufficient deed or deeds of said lands, in accordance with the terms of said contracts. As the complainants did not appeal, the decree of foreclosure would not be made in the absence of the consent of the defendants, inasmuch as it formed no part of the decree of the circuit court. We think that the complainants were entitled to it, and it should be included upon the understanding that it is consented to.

GRANT, J. I concur in the opinion of my Brother HOOKER. I see no occasion, however, to withdraw from my former opinion. It was not the intention of that opinion to charge Mr. Fisher with deception or fraud. That he acted in good faith, I do not doubt. He failed to record his third contract, or to notify the creditors or the trustee at the time the trust deed was executed of the existence of the contract. He had failed to keep his interest insured. The creditors, at the time of the compromise with the Lansing Lumber Company, understood that all the logs at the mill and in the booms belonged to, and were the property of, the lumber company. They made their compromise upon that basis. I see no reason why he should not now be estopped to set up his claim to any interest in the insurance money. It was not insured as his property.

LONG, C. J. I am unable to agree with my Brother HOOKER in this case. It now seems to be well established that the Michigan Trust Company had full knowledge of the claim of complainants under their contracts with

the Lansing Lumber Company, and recognized the fact that under these contracts the title to the logs and lumber remained in the complainants. If we were able to find in the record any showing that the complainants or Mr. Fisher understood that this property was to be included in the trust deed, and that the creditors were being deceived or misled as to its ownership, and that the complainants, so understanding, sat by, and permitted the deed to be executed and the creditors to be deceived, making no objection, and allowing the creditors to surrender substantial rights which they had and might have asserted had they not been so deceived and induced to surrender their former evidences of debt and accept the bonds secured by the deed, then the complainants might be held estopped; but such facts do not appear. The complainants were notified of the meeting of the creditors of the Lansing Lumber Company. Mr. Barnes, on May 19, 1893, wrote Mr. Fisher substantially that the proposition of the creditors was to fund the indebtedness, and the contract to contain a provision that the trustee might borrow money to pay all indebtedness which constituted a lien upon the property, and added:

" As soon, therefore, as the papers can be prepared, and the consent of the creditors can be obtained, the trustee will at once take up and pay your claim, because you are one of the individuals, and your debt one of the debts, that is to be paid by the trustee by borrowing money at once, if necessary, for the purpose of payment."

A few days later Mr. Barnes wrote Mr. Fisher again saying:

" As soon as the mortgage is ready, I will send you a copy, so that you can see that your debt is to be paid first of all."

On May 26th Mr. Barnes sent Fisher a copy of the mortgage, calling attention to the seventh clause, advising him that it amply protected him as a preferred creditor. This mortgage or trust deed contained a clause stating substantially that certain of the lands of the Lan-

sing Lumber Company were held by it under contract, and that a portion of the purchase money thereon remained unpaid, and empowering the trustee to advance or borrow money to pay off such indebtedness, in order that the title to the property might be fully vested in the trustee. The title to the lands of the complainants from which the logs and lumber were taken remained in the complainants until payments were fully made. A few days after the mortgage was executed, and on June 19th, Mr. Barnes again wrote, saying that it was expected that the indebtedness to special creditors, "of which you are one," would be taken up and paid; and, on July 3d following, again wrote that the notes which had been given complainants on this purchase had been reported to the trustee as secured property, and they had decided not to issue bonds for secured debts unless the parties preferred them; that the mortgage provided that "they will pay all claims covered by liens upon land before paying any other to other parties;" and in the same letter said, "This gives you your full pay before any holders of bonds receive theirs." On July 26th, Mr. Barnes again wrote:

"I will now refer your letter to the trustee. You will remember that you are one of two of the very first men to be paid out of the income of the lumber company."

On July 24th Mr. Fisher had written Mr. Barnes a letter, which he had forwarded to Mr. Withey, the president of the Michigan Trust Company, the trustee named in the mortgage; and on July 28th Mr. Withey wrote Mr. Fisher, acknowledging the receipt of the letter, and saying:

"As you are perfectly secure, as we understand it, we hope you will let the matter rest quietly as it is until such time as they [the lumber company] are able to shape themselves around to meet it; and we can assure you that your claim will not be out of our minds."

On July 31, 1893, Mr. Fisher replied to Mr. Withey, advising him that the Lansing Lumber Company owed

them (the complainants) "over $12,000, the same being secured by land contracts, and covers not only the standing timber, but the logs and lumber,   *   *   *   the title to which has never passed to them." He also added:

"As I understand,   *   *   *   these claims of ours were preferred claims.   *   *   *   I must now insist that this matter be taken up, or we will be obliged to protect ourselves by due process of law, against the lumber, logs," etc.

On August 2d Mr. Withey replied, saying that he did not understand that the land contracts covered, not only the standing timber, but the logs and lumber now on hand, and added:

"So long as parties have ample security, we do not think there would be any justification in taking so severe measures as you suggest, and we trust that you will treat the Lansing Lumber Company with such leniency as the times will seem to warrant."

Mr. Fisher replied to this that he had been assured by the Lansing Lumber Company that, "as soon as this trust was formed," their claim should be paid, and urging that it be attended to promptly. Two days later, Mr. Withey writes, excusing delay on the part of the Lansing Lumber Company, and says:

"Your security is perfectly good, and that is a good deal more than most creditors have in these days; so we shall expect that you will be patient, and not press payment of the matter at the present time."

On September 28th Mr. Withey again wrote, saying:

"We hope, in a reasonable time, to pay you something on your claim."

On December 2d he wrote again, saying that the Lansing Lumber Company was doing better, that it had been able to meet the interest on its bonds which matured November 1st, and then proposed to take care of such matters as the complainants' just as speedily as possible.

We think it will be readily seen that the defendants

are not in a position to interpose the defense of estoppel to complainants' claim. Here the trustee had been fully advised of the claim of complainants that they held the title, not only to the lands, but to all the logs and lumber taken from the land, until their claim should be fully paid and satisfied. The trustee, by the very terms of the trust deed, was fully authorized and empowered to advance or borrow money to pay complainants' claim. In addition to this, when Mr. Fisher threatened to pursue a remedy open to him, and which would have secured his claim beyond question,—that is, by seizure of the logs and lumber,—the trustee, by its president, asks that the matter be delayed, promising, from time to time, that the claim would be paid. During all this time Mr. Withey treated the claim as secured under these contracts by reason of the title remaining in the complainants. It is certain that he must have known that the complainants' claim was a secured claim, though he may not have seen Exhibit C—the last contract with the Lansing Lumber Company —until after the trust deed was made. He knew on July 31st that the claim amounted to over $12,000, and that it was secured by these land contracts, covering all the logs and lumber, the title to which remained in complainants. We cannot find upon this record that a fraud was practiced by the complainants upon the creditors of the Lansing Lumber Company, or that they sat by and permitted the other creditors to part with something of value. The complainants were well secured by the retention of title in themselves to all this property. They could, and undoubtedly would, have taken possession of it, but for the interposition of the trustee. So that, upon the first proposition, I am of the opinion that the defense sought to be made has no foundation.

But it is held by my Brother HOOKER that the complainants are in no position to assert rights in the moneys arising from the loss of the property by the fire. There is great force in his suggestion that, the trustee having an insurable interest in the property, such interest could

be insured, and that the moneys arising from the loss could not be held by the complainants. The circumstances surrounding this case are, however, very peculiar, and the conduct of the Lansing Lumber Company and the trustee quite remarkable in many respects. Three contracts were made between these parties. Under the first,—made November 21, 1887,—the Lansing Lumber Company could not cut or take any of the timber from the land without the written assent of the complainants. This was also true of the second contract, made December 5, 1888. On September 24, 1890, however, a new contract was made, containing this provision:

"Now, therefore, it is hereby agreed between the parties hereto that the entire title, ownership, and right of possession in and to all logs, timber, and lumber heretofore cut and removed from or remaining on said lands, and now under the control of or in the possession of said second party, shall be and remain in first parties, and the title and ownership of all logs, timber, and lumber hereafter cut or manufactured from said lands shall be and remain in first parties, until the full payment of all moneys due or to become due on either or both of said contracts, and the notes executed in connection therewith, or any notes executed in renewal of any such notes. It is further agreed that the second party shall mark plainly, as directed by first parties, all logs, timber, and lumber already cut or manufactured from said lands, and now in second party's possession or control, and also, in like manner, shall mark all logs, timber, and lumber that shall hereafter be cut or manufactured from said lands, with the mark of first parties, which is TAT; marking irons for such mark being furnished to second party by first parties. It is further agreed that the logs and timber shall be manufactured into lumber, and piled at second party's mill in Clare county, Michigan, in a good and workmanlike manner; and said first parties may insure same in their own names or otherwise, as they may deem advisable, and said second party shall pay the expense thereof; and, in case second party shall fail to pay for such insurance, and first parties shall pay the same, second party shall pay to first parties such cost and expense of insurance, together with interest thereon," etc.

Under these contracts most of the timber has been removed, so that the lands are comparatively worthless. Upon the execution of the last contract, the lumber was insured by the Lansing Lumber Company, in its name, for $65,000, and thereafter, at the request of complainants, the loss, if any, was made payable to them. These policies expired in June, 1891. On December 11, 1891, complainants wrote to have the policies forwarded to them. This was done, and it was found that the policies amounted to $37,250, and losses made payable to complainants. These policies expired in 1892. It appears that complainants never caused any policies to be issued, apparently relying upon the Lansing Lumber Company to do so. No further policies were taken out by that company; but, upon the execution and delivery of the trust deed, the trustee caused the property to be insured in its name. The insurance stood in this way when the letters were written by the complainants to Mr. Withey in July, 1893. Mr. Withey knew then that the complainants held the title to all the lumber cut from the logs taken off the lands described in the contracts. The fire occurred on March 10, 1894. At that time, according to the testimony of Mr. Wheeler, the foreman at the mill of the Lansing Lumber Company, about one-half of the lumber on hand, and which was destroyed by the fire, was cut from logs taken from complainants' lands, and the title of this lumber was in complainants. This lumber had been marked with the complainants' mark after it had been piled. There was about 8,000,000 feet in the yard in all. The insurance on the mill was paid, amounting to six or seven thousand dollars; the rest of the insurance was paid for the loss of the lumber. It can hardly be contended that the insurance money received was not for the loss of complainants' as well as the other lumber in the yard. It is true that the insurance did not run to the complainants, but to the Michigan Trust Company. But that company collected and appropriated the whole moneys arising from such insurance,

and refuses to account to the complainants for it, asserting that it has gone into the general fund for the benefit of the general creditors of the Lansing Lumber Company. This claim is most unjust and inequitable, and should not be sustained, unless by the strict rules this court is powerless to do what right and justice demand. The prayer of the bill is that the complainants' claim be paid out of the moneys obtained from this insurance, but there is also a general prayer for relief.

I shall now consider the position of the general creditors. It appears from the record that, at the meeting of those creditors when the trust deed was agreed upon, such creditors were informed that complainants' claim was a preferred one, and should be paid before any of the bondholders were paid. The committee appointed by the creditors was advised of this fact, and it is evident that the clause was inserted in the trust deed above referred to, which authorized the trustee to borrow money to pay such preferred or secured claims, in view of this fact; that it was well understood by the creditors that this was one of the claims necessary to be paid, so that the title to the property would pass to the trustee. At that time the complainants, upon the neglect or refusal of the Lansing Lumber Company or the trustee to pay such claim, could have taken possession of the property, and sold it in payment of their claim. To avoid this, and to place the title in the trustee, the clause in the deed was evidently inserted. How much Mr. Withey understood of this at the time it is now unnecessary to determine. He found that clause in the deed, and in July following was notified by complainants that they held this title. He wrote them on August 2, August 5, September 28, and again on December 2, 1893, recognizing the fact that such claim was one of those preferred, and asking them not to press payment, as their claim was perfectly good, that they had ample security; and thus put them off from commencing any proceeding to collect from the property itself the amount of this claim, then amouning to over $12,000.

All this time the trustee was holding the insurance policies covering the entire lumber, and after the fire collected for the loss, and then for the first time insisted that the complainants, not having the property insured in their name or for their own benefit, had no right to any portion of the money arising from the loss, and that the whole of it should be applied to the payment of the general creditors. Not only this, but it is claimed here that the trustee should not be decreed to pay the claims which not only the general creditors recognized as preferred, but one which the trustee also recognized as preferred, and which it could, under the trust deed, borrow the money to pay, and which would have been collected by the complainants had not the trustee begged for time, and which the complainants generously extended. The claim should be paid for the reasons:

1. That the general creditors authorized the trustee to make the payment.

2. That the trust deed authorized its payment.

3. That the trustee was advised of all the facts before the fire, and promised payment, and asked an extension of time in which to meet the demand, which extension was granted.

4. That the complainants, at the request of the trustee, withheld action in taking possession of the logs and lumber in reliance upon the promise of the trustee that they would be paid.

5. That the trustee had the power to pay conferred upon it by the trust deed. Having this power, it was a preliminary that it was to determine; and we think Mosher and Fisher had the right to rely upon its assurance that the trust funds in its hands would be devoted to that purpose.

6. That the trustee should be estopped from now claiming that the complainants are not entitled to be first paid; for, whatever may be the actual intent of a party to a transaction, if he so acts as to lead a reasonable person to believe that he understands and assents to its

terms, and the other party, so believing, acts accordingly, the former is estopped from asserting that he did not so understand and assent. *Peake* v. *Thomas*, 39 Mich. 585; *Vanneter* v. *Crossman*, 42 Mich. 465. Here the complainants had it in their power to make their claim good. They did not do so in reliance upon the payment of their claim. The trustee ought not now to be permitted to assert title, collect the insurance, and then deny liability upon the demand.

But my Brother HOOKER contends: (1) That the letters do not indicate any intent on the part of the trustee to pay the claim, but rather a willingness that the Lansing Lumber Company should pay from funds coming into its possession. (2) That there is no consideration shown for the promise. (3) That the trustee received from the insurance companies only what was equitably due the trustee. In these contentions I cannot agree. The trustee, under the trust deed, took every dollar's worth of property, both real and personal, which the Lansing Lumber Company had or controlled. After describing certain real and personal property which was to pass under the trust deed, it is provided:

"And also all other personal property of the said Lansing Lumber Company, of every nature and kind, including bills and accounts receivable, wheresoever the same may be situated, and all other personal property which may be hereafter acquired by the said Lansing Lumber Company during the lifetime of this security, including any revenue derived by the party of the first part from whatsoever source, and also all deeds, mortgages, contracts, assignments of contracts, and all muniments of title to real and personal estate; it being the intention to embrace in this security all the real and personal property of said party of the first part and the income from its business."

The trust deed then provides that the trustee may pay the class of claims held by the complainants, and for this purpose he is expressly empowered—

"To borrow money to pay off the money remaining unpaid on said land contracts, * * * in order that the

title to all said property may be fully vested in said trustee, free of all incumbrances, for the uses and purposes of this trust, and for the better security of the holders of bonds hereunder issued. And the said party of the second part is hereby authorized and empowered to pay off the money so advanced or borrowed, with interest thereon, to perfect the title to said lands, or release the same from existing liens, out of any money that may come into its hands as trustee, before applying any to the payment of bonds hereunder issued, and these presents shall inure as a security for the same."

The trust deed further provides that—

"All moneys received by said company during the continuance of said trust shall be deposited in some bank or banks to be selected by said trustee, the deposit to be to the credit of said trustee. For the purpose of providing for the disbursements, including the interest, taxes, insurance, and expenses of said company in the regular course of its business, said trustee shall turn over to said company such amounts as shall from time to time be necessary for that purpose, provided that the amount so in the hands of the company for current expenditures shall at no time exceed the sum of $10,000."

In *Michigan Trust Co.* v. *Lansing Lumber Co.*, 103 Mich. 392, this trust deed was held to be a mortgage; but that holding in no manner affects the question here.

Can it be possible that the letters can have the construction placed upon them by my Brother HOOKER? The Lansing Lumber Company did not have a dollar with which to pay any debt. All the property went to the trustee, and even the income from the business was to go into the bank in the name of the trustee. Undoubtedly, the trustee intended that the moneys to pay the complainants should come from the funds realized from the Lansing Lumber Company; but the letters, in my opinion, meant no more than this. The circumstances surrounding the transaction and the situation of the parties were such that no other interpretation can plausibly be given. It was, therefore, the promise of the trustee to pay if the complainants would forbear prosecution of their claim. But was there any consideration for such

promise? The general rule is that an agreement to forbear to prosecute a suit is a sufficient consideration for a promise. In *Parsons* v. *Frost*, 55 Mich. 230, the note in suit was within a few days of being barred by the statute of limitations, when the plaintiff, upon the understanding that one of the defendants should indorse the note, was induced to forbear suit until the other defendant, who was the maker, should return from Europe. It was held that this forbearance was a sufficient consideration for the indorsement, and the indorser and maker were held liable. The present case is much stronger. Here the proposition came from the trustee. He promised, if complainants would forbear bringing suit and taking the property into possession, that the Lansing Lumber Company would very soon have funds for the payment of the debt. The complainants rested upon this promise of payment, and did not bring suit. Can it be said that this was not a sufficient consideration? I think not. Neither do I think that it was the promise that the Lansing Lumber Company would pay, when we take the situation of the parties into consideration.

From this view of the case it cannot matter whether the trustee received only what was equitably due it or not. The lumber burned was situated at the mill yard. There was about 8,000,000 feet of it. But the uncontradicted testimony shows that 4,000,000 feet of this lumber came off the lands of the complainants. When the fire occurred, the title to all that part of the lumber remained in the complainants. They had not taken possession of it because of the promise of the trustee that it would soon be paid for. They evidently relied upon this promise, and permitted the lumber to be treated as the property of the trustee. When the insurance moneys were paid, then for the first time they were told that they must look to the lands for the payment of the balance of their claim. These lands appear to be worthless. One-half of the insurance money came from the loss of the complainants' lumber. The trustee has it. It would be most inequit-

able to permit the trustee to now pay it over to other creditors. It had power to make the arrangement by which complainants forbore to commence suit. It should now keep the promise good. The other creditors would not suffer. The insurance money coming from the loss of complainants' lumber was so much clear gain to them. If the lumber had not burned, the trustee could not have taken it without the payment of the claim. Equity and justice require that it should now pay.

The decree will be affirmed.

MONTGOMERY and MOORE, JJ., concurred with LONG, C. J.