Potter, J.
 

 Plaintiffs, trustees under two trust mortgages, made and executed by the Northern Michigan Land Company, November 1, 1918, and September 1, 1919, given to secure the payment of $1,500,000 and $900,000 respectively in par amount of the bonds of the Northern Michigan Land Company, and to perform the covenants contained therein, filed a bill of complaint August 17, 1922, in Schoolcraft county, to correct descriptions of real estate covered by the trust mortgages, foreclose the same, determine and preserve the rights of bondholders thereunder, and procure payment of moneys
 
 *409
 
 advanced by plaintiffs in carrying out the terms of the trust, and for other relief. Many separate answers and disclaimers were filed. Testimony was taken at different times from June 28, 1923, to June 15, 1925, and December 5, 1925, a decree was rendered by the trial court for plaintiffs and defendants Lynch Timber Company, Cadillac Lumber & Chemical Company, Jackson & Tindle, Inc., EmburyMartin Lumber Company, William Bonifas Lumber Company, National Pole Company, and William Bonifas, and the estate of James Blake. Plaintiffs appealed from the decree of the trial court allowing the claims of defendants above named; the Cadillac Lumber
 
 &
 
 Chemical Company has taken a cross-appeal, and the Goodman Cedar Company, William Bonifas Lumber Company, William Bonifas and M. J. Bice, and Jackson
 
 &
 
 Tindle, Inc., have taken appeals from such decree. The case was argued in the June, 1927, term of this court and assigned to the late Justice Bird, who died before submitting an opinion herein. The case has been reargued and reassigned.
 

 November 1, 1918, the Northern Michigan Land Company executed a trust mortgage to Balph O. Olson and John A. Hartigan, trustees, covering approximately 300,000 acres of land in Northern Michigan to secure the payment of $1,500,000 of its bonds, of which issue but $370,000 were issued. September 1, 1919, a second trust mortgage was made by the same mortgagor to the same trustees to secure the payment of $900,000 in par amount of its bonds. The first trust mortgage covered the real estate described therein and several land contracts for lands in Luce, Schoolcraft, Chippewa, and Mackinac counties; 70 or more real estate mortgages given by Samuel B. Loux and Ella M. Loux, his wife, to
 
 *410
 
 Interstate Farms Company covering lands in Chippewa county; 20 other real estate mortgages given by Loux and wife to Interstate Farms Company covering lands in Chippewa county; 8 real estate mortgages given by Northern Michigan Land Company to J. B. Sullivan and assigned by Sullivan to mortgagor covering lands in Mackinac county; 30 or more land contracts covering lands in Chippewa county; one land contract covering lands in School-craft county; four land contracts covering lands in Mackinac county, and three land contracts covering lands in Luce county.
 

 The first mortgage of November 1, 1918, provided for the release of lands from the lien of the mortgage, in case of their sale by the mortgagor. The release clause is set forth in Appendix 1. It also provided the trustees might
 

 “also release portions of the security on different terms than specified in the release clause herein, when in their judgment the remaining security is ample to protect the bondholders, and when, in their discretion, it is to the bondholders * advantage to do so.”
 

 It also provided:
 

 ‘
 
 ‘
 
 The trustees shall be held only to the exercise of reasonable care and diligence in relation to managing and selling the property hereby conveyed, or otherwise carrying out the provisions hereof, and where they act by or through agents, or attorneys, they shall not be responsible for- their wrongdoing, but they shall be held to the exercise of reasonable care in selecting and discharging the same.”
 

 The second mortgage recites the giving of the first mortgage, November 1, 1918; that there had
 
 *411
 
 been released from the lien of the first mortgage, all of the lands, mortgages, contracts, and other securities covered thereby, except the lands specified and described in the second mortgage; that out of the $1,500,000 in par amount of the bond issue authorized by the mortgage of November 1, 1918, but $370,000 had been certified and issued; that the balance of the bonds authorized thereby and attached interest coupons secured thereby had been canceled; that the holders of all of the $370,000 in par amount of outstanding bonds had consented in writing to change the terms and conditions of the entire issue of bonds, and the trust deed given to secure the same in accordance with the terms and conditions of the second mortgage; that it was desired by the mortgagor to reduce the amount of bonds to be secured by the mortgage upon the balance of the property referred to in the original mortgage, not released therefrom, to $900,000 in par amount, including the $370,000 first mortgage bonds outstanding, and continue the security of the same by a first mortgage upon the lands described in the original mortgage except in so far as the same have been released; to modify the terms, conditions, and maturities of the $900,000 of bonds, and to modify, amend, and supplement the terms and conditions of the original mortgage for the purpose of securing, the $900,000 in par amount of bonds; that the $370,000 of bonds issued and outstanding under the first mortgage had been surrendered to the trustees to be canceled upon being replaced by $297,000 of the new bonds. It excepts such reservations as are shown in the schedule of lands attached thereto and such as appear in the mortgagor’s chain of title.
 

 The second mortgage of September 1, 1919, con
 
 *412
 
 tained a release clause as set forth in Appendix 2. It also provided:
 

 “The trustees may select and employ in and about the execution of the trusts hereby created and the duties hereby imposed, suitable agents and attorneys whose reasonable compensation shall be paid by the company to the trustees, or in default of such payment, shall be a charge upon the property hereby conveyed, and the proceeds thereof, paramount •to said bonds and the interest hereon; and the trustees shall in no event be held liable to any neglect, omission or wrongdoing of any such agents or attorneys, reasonable care being exercised in their selection. The trustees, save for their own gross negligence or wilful default, shall not be liable for any loss or damage.”
 

 The dispute here does not concern the execution and delivery of the mortgages, the amount due thereon, default in payment, the amount advanced by the trustees in carrying out the trust, or their right to reimbursement for advances expended by them.
 

 When the first mortgage was recorded in the office of the register of deeds of Chippewa county, $7,500 was paid as mortgage tax upon the whole amount of bonds authorized thereby to be issued. But $370,000 of these bonds were issued. It is claimed the second mortgage is exempt from the mortgage tax because $7,500 in mortgage tax has already been paid. The tax on the amount of bonds authorized by the second mortgage would be $4,500. Plaintiffs claim the second mortgage was given to correct and perfect the previous mortgage and under section 4270, 1 Comp. Laws 1915, no mortgage tax should be collected on any mortgage made to correct or perfect a mortgage previously recorded, on which the charges imposed by the act have been paid, if no new or additional in
 
 *413
 
 debtedness is created thereby, and, if any tax should be paid thereon, it should be $1,950, not $4,500. The trial court found plaintiffs should pay an additional tax of $4,500.
 

 Was and is the second mortgage exempt from the mortgage tax? It is not apparent that the second mortgage was given to correct descriptions of property covered by the first mortgage, or that such mortgage was given to perfect the lien of the first mortgage. The second mortgage involved a change in the method of mortgagor financing its indebtedness. The issuance of the second mortgage Involved cancellation of the authorized bond issue of $1,500,000— $370,000 of which had been issued and sold. It involved surrender .and cancellation of $370,000 in bonds issued and outstanding under the first mortgage and the substitution therefor of $297,000 of bonds issued under the second mortgage. It involved a reduction of $600,000 in amount of bonds authorized by mortgagor to be issued and sold, releasing from the mortgage lien over 40 land contracts and, more than 95 real estate mortgages security for payment of- bonds issued and to be issued under the first mortgage. The second mortgage, if made to correct or perfect the previous mortgage, was a new and substituted' lien, a security involving a different method of financing on the part of mortgagor. When the second mortgage was offered in evidence its reception was objected to because the mortgage was void by reason of nonpayment of the mortgage tax thereon, and, being void, did not constitute notice, express or implied, to anyone. We think failure on the part of the mortgagor to pay the mortgage tax under the circumstances here involved did not render the second mortgage void, but plaintiffs cannot enforce this mortgage without payment of the
 
 *414
 
 mortgage tax thereon.
 
 Amos
 
 v.
 
 Givens, 179
 
 Ala. 605 (60 South. 829);
 
 Mutual Life Ins. Co.
 
 v.
 
 Nicholas,
 
 144 N. Y. App. Div. 95 (128 N. Y. Supp. 902);
 
 Metropolitan Trust Co.
 
 v.
 
 State Board of Tax Com’rs, 172 N.
 
 Y. App. Div. 653 (158 N. Y. Supp. 796) ;
 
 People
 
 v.
 
 Bristol,
 
 35 Mich. 28;
 
 Orr
 
 v.
 
 Sutton,
 
 119 Minn. 193 (137 N. W. 973, 42 L. R. A. [N. S.] 146).
 

 Mortgagor was under no obligation to pay more than $1,850 in mortgage'tax on the $370,000 of bonds issued under the first mortgage. It voluntarily paid the tax on the full amount of the authorized first bond issue of $1,500,000.' This was $5,650 more than mortgagor needed to have paid. This amount having been voluntarily paid by mortgagor, neither plaintiffs nor mortgagor may now sue and recover it back.
 
 City of Detroit
 
 v.
 
 Martin,
 
 34 Mich. 170 (22 Am. Rep. 512);
 
 Cox
 
 v.
 
 Welcher,
 
 68 Mich. 263 (13 Am. St. Rep. 339);
 
 Lingle
 
 v.
 
 Township of Elmwood,
 
 142 Mich. 194.
 

 Real estate mortgages made and executed since the effective date of Act No. 62, Laws 1843 (3 Comp. Laws 1915, § 13221), are personal property, securities, collateral to the indebtedness they are given to secure; evidence of a lien upon real estate, which may be foreclosed and title to the real estate acquired at the expiration of the equity of redemption.
 
 Dougherty
 
 v.
 
 Randall,
 
 3 Mich. 581;
 
 Wagar
 
 v.
 
 Stone,
 
 36 Mich. 364;
 
 Nims
 
 v.
 
 Sherman,
 
 43 Mich. 45;
 
 Michigan Trust Co.
 
 v.
 
 Lansing Lumber Co.,
 
 103 Mich. 392;
 
 Bowen
 
 v.
 
 Brogan,
 
 119 Mich. 218 (75 Am. St. Rep. 387);
 
 Dawson
 
 v.
 
 Peter,
 
 119 Mich. 274;
 
 Union Trust Co.
 
 v.
 
 General Electric Co.,
 
 152 Mich. 568.
 

 This rule applies to mortgages executed by corporations to secure bondholders, as well as to mortgages given or taken by individuals.
 
 Flint, etc., R. Co. v. Auditor General,
 
 41 Mich. 635;
 
 Michigan Trust
 
 
 *415
 

 Co.
 
 v.
 
 Lansing Lumber Co., supra; Union Trust Co.
 
 v.
 
 General Electric Co., supra.
 

 Even though real estate is deeded in trust by a conveyance absolute in form, if the conveyance was for security only, the deed may be shown to be a mortgage.
 
 Swetland
 
 v.
 
 Swetland,
 
 3 Mich. 482;
 
 Emerson
 
 v.
 
 Atwater,
 
 7 Mich. 12;
 
 Jeffery
 
 v.
 
 Hursh,
 
 58 Mich. 246;
 
 Clark
 
 v.
 
 London,
 
 90 Mich. 83, 90;
 
 McDonald
 
 v.
 
 National Bank,
 
 111 Mich. 649.
 

 Although the two mortgages involved are referred to as deeds of trust, as if some additional rights depended upon the words, they are evidences of a lien on property given to secure the payment of the respective bond issues mentioned therein. In addition to the mortgagor’s corporate promise to pay the bonds, the holder thereof has a lien upon the real estate'by the mortgages, and only upon foreclosure of the same and the expiration of the equity of redómption may purchasers at the mortgage foreclosure sale become vested with title.
 

 There is dispute between the parties as to the timber permits involved herein, a form, of which in general use will be found in Appendix 3. Plaintiffs contend they are mere licenses, revocable at the pleasure of licensor. A license is a permission, a right given by some competent authority to do an act which wdthout such authority would be illegal or a tort or trespass. Bouvier’s Law Dictionary, title “License.”
 

 In
 
 Morrill
 
 v.
 
 Mackman,
 
 24 Mich. 279 (9 Am. Rep. 124), it is said:
 

 “A license is a permission to do some act or series of acts on the land of the licensor wdthout having any permanent interest in it: 3 Kent, 452;
 
 Cook
 
 v.
 
 Stearns,
 
 11 Mass. 538;
 
 Woodbury
 
 v.
 
 Parshley,
 
 7 N. H. 237;
 
 Prince
 
 v.
 
 Case,
 
 10 Conn. 375;
 
 Wolfe
 
 v.
 
 Frost,
 
 
 *416
 
 4 Sandf. Ch. 91. It is founded on personal confidence, and therefore not assignable: 3 Kent, 452; Brown on Stat. of Frauds, § 22. It may be given in writing or by parol; it may be with or without consideration; but in either case it is subject to revocation, though constituting a protection to the party acting under it until the revocation takes place. ’ ’
 

 All of the timber permits involved herein contain the language “hereby grants * * * the right to cut and remove. * * , * all of the merchantable timber now standing or being upon the following-described lands.”
 

 A grant is the passing of something from one to another.
 

 “This word is taken largely where any thing is granted or passed from one to another. * * * Regularly these things are requisite in every good grant or gift; 1. That there bo a-grantor, donor, etc., and that he be a person able to grant, and not disabled by any legal or natural impediment. 2. That there be a grantee, donee, etc., and that he be a person capable of the thing granted, and not disabled to receive it. 3. That there be a thing granted, and that the' thing be such a thing as is grantable., (Or a charge created, or a duty, right or title discharged; or an obligation created, or an election or authority communicated.) 4. That it be granted in that order and manner-that (viz., which the) law requireth; as where the thing is not grant-able without deed, that it be done by deed. And if it be (granted) by deed, that the deed have apt words to describe and set forth the person of the grantor arid grantee, and thing granted, etc.; and that all necessary circumstances, as sealing, and delivery, and livery of seisin, and attornment where it is needful, be observed. (The necessity of attornment is now superseded by the stat. of 4 .and 5 Ann, c. 16. See chap. Attornment.) 5. That there be an agree
 
 *417
 
 ment to, and acceptance of, the grant or thing granted by him to whom it is made; (a fact which is to be presumed till the contrary be shown.
 
 Thompson
 
 v.
 
 Leach,
 
 3 Mod. 296.) And for default in either of these particulars a grant may be void.” 1 Sheppard’s Touchstone, 227, 229.
 

 Deeds of real estate, to be entitled to record, must be acknowledged, but an acknowledgment is not a part of the conveyance.
 
 Brown
 
 v.
 
 McCormick,
 
 28 Mich. 219;
 
 Livingston
 
 v.
 
 Jones,
 
 Har. Ch. 165. Title to real estate may be transferred by conveyances not acknowledged.
 
 Price
 
 v.
 
 Haynes,
 
 37 Mich. 487. Deeds in order to be recorded should be witnessed, but a deed not witnessed is good between the parties.
 
 Fulton
 
 v.
 
 Priddy,
 
 123 Mich. 298 (81 Am. St. Rep. 201);
 
 Carpenter
 
 v.
 
 Carpenter,
 
 126 Mich. 217;
 
 Baker
 
 v.
 
 Clark,
 
 52 Mich. 22;
 
 King
 
 v.
 
 Carpenter,
 
 37 Mich. 363;
 
 Brown
 
 v.
 
 King,
 
 172 Mich. 355. The term “timber” has a well defined meaning, recognized by statute (1 Comp. Laws 1915, §§ 661, 662, 3 Comp. Laws 1915, §§ 14632, 15332) and judicial decision
 
 (Balderson
 
 v.
 
 Seeley,
 
 160 Mich. 186 [19 Ann. Cas. 1049, 136 Am. St. Rep. 428]).
 

 Standing timber is real estate. It is a part of the realty the same as the soil from which it grows.
 
 Stout
 
 v.
 
 Keyes,
 
 2 Doug. 184 (43 Am. Dec. 465);
 
 Johnson
 
 v.
 
 Moore,
 
 28 Mich. 3;
 
 Russell
 
 v.
 
 Myers,
 
 32 Mich. 522;
 
 Fletcher
 
 v.
 
 Township of Alcona,
 
 72 Mich. 18;
 
 Williams
 
 v.
 
 Hyde,
 
 98 Mich. 152;
 
 Delaney
 
 v.
 
 Manshum,
 
 146 Mich. 525;
 
 Dunn
 
 v.
 
 Papenfus,
 
 202 Mich. 131;
 
 Morris
 
 v.
 
 Morris,
 
 210 Mich. 36;
 
 Mulder
 
 v.
 
 Durand Hoop Co.,
 
 238 Mich. 373.
 

 “Standing timber is a part of the realty and is subject to the same law as the land itself. It may be sold separate from the land, but so long as it stands it remains a part of the realty.”
 
 Mulder
 
 v.
 
 Durand Hoop Co., supra.
 

 
 *418
 
 Where a conveyance is made of the land with an express reservation of the standing timber thereon, snch timber excepted or reserved from the conveyance remains real estate.
 
 Morris
 
 v.
 
 Morris, supra.
 

 In
 
 Wade
 
 v.
 
 Day,
 
 232 Mich. 458, there was a conveyance of the land by warranty deed and simultaneously a separate conveyance back of the timber conveyed. The parties knew of this transfer and plaintiff took ydth knowledge of its terms. The court construed the two instruments together as constituting a conveyance of land with a reservation of the timber thereon.
 

 In these timber permits there is a grantor and a grantee. There is a valuable consideration. There is a grant expressly made. Such grant purports to convey a particular right, namely, the right to cut and remove the merchantable timber. The object of the grant is something of value. Instead of mere licenses these instruments‘amount to a conveyance of an interest in real estate. They sell and convey the privilege of cutting and removing the timber. They are in force and effect for a specified time. They constitute a sale of the timber upon condition —a grant of an interest in property. They are not subject to revocation during the time of their operation, so long as the conditions upon which the grant is made are performed. They are just as effective to transfer the interest in real estate covered and conveyed by them as if they were in form warranty deeds. They may not be subject to record. The title conveyed by them may be cut off by transfer of the fee to an innocent purchaser for value without notice of the rights of the grantee thereunder, but they are, to all intents and purposes, deeds of standing timber, with a right to remove it within a specified time.
 

 
 *419
 
 The dispute as to their effect arises over the claimed conflict between the rule of
 
 Hodges
 
 v.
 
 Buell,
 
 134 Mich. 162, and
 
 Scott
 
 v.
 
 Sullivan,
 
 159 Mich. 297.
 

 In
 
 Hodges
 
 v.
 
 Buell, supra,
 
 injunction was sought to restrain the cutting and removal of timber by-complainant who had owned the land and sold and conveyed it by deed which contained a reservation as follows:
 

 “First party reserves all saw timber on said land, with right to enter upon and remove same within two years, also right to build roads across and cross said land within two years from date. ’ ’
 

 Chief Justice Hooker fox the court critically reviewed the prior Michigan cases of
 
 Green
 
 v.
 
 Bennett,
 
 23 Mich. 468;
 
 Monroe
 
 v.
 
 Bowen,
 
 26 Mich. 524;
 
 Richards
 
 v.
 
 Tozer,
 
 27 Mich. 451;
 
 Johnson
 
 v.
 
 Moore,
 
 28 Mich. 3;
 
 Haskell
 
 v.
 
 Ayres,
 
 32 Mich. 93;
 
 Utley
 
 v.
 
 Lumber Co.,
 
 59 Mich. 263;
 
 Wait
 
 v.
 
 Baldwin,
 
 60 Mich. 626 (1 Am. St. Rep. 551);
 
 Williams
 
 v.
 
 Flood,
 
 63 Mich. 487;
 
 Gamble
 
 v.
 
 Gates,
 
 92 Mich. 510;
 
 Macomber
 
 v.
 
 Railroad Co.,
 
 108 Mich. 491 (32 L. R. A. 102, 62 Am. St. Rep. 713), and concluded:
 

 “It would seem to be finally settled in this State that, where one acquires title to standing timber, the same to be removed within a time stated, he cannot be devested of his title to such as he severs from the soil during the period, whether he takes it away from the premises within such period or not (except where, as in
 
 Gamble
 
 v.
 
 Gates, supra,
 
 it is expressly provided that such timber should revert); but that he is devested, by lapse of time, of the title to such as was not severed. * * * It is equally clear that all of the timber severed from the soil by the defendants was
 
 removed,
 
 though still upon the premises, and belonged to them, for we think no distinction should be drawn as to such timber before
 
 *420
 
 and after it was cnt np into sawlogs. * * * Indeed, we see no reason for saying that they were not entitled to treat all down timber severed from the soil as removed, whether they had pnt work upon it or not. ’ ’
 

 In
 
 Scott
 
 v.
 
 Sullivan,
 
 159 Mich. 297, a bill was filed to foreclose a mortgage given by Sullivan to Scott. The contest arose over timber on 3,520 acres of land, between the owners of the fee of the land — the claimed owners of the standing timber — on the one hand, and the mortgagor and mortgagee of the timber on the other. The Wilmot Mining Company first owned the land and timber in fee. September 9, 1902, it gave a timber permit to Burns. November 3, 1902, Burns sold it to Norton, who, December 3,1902, sold it to Sullivan, who, November 8, 1905, mortgaged the timber to Scott. October 3,1904, the Wilmot Mining Company sold the fee in the land to Blake, reserving the timber and the right of removal. July 16, 1906, Blake conveyed an undivided three-fourths interest therein to Gates and Johnson with the same timber reservation and right of removal. September 16, 1907, the Wilmot Mining Company conveyed its rights in- the timber to Blake, Gates, and Norton. Thus the contest for the timber was between Scott and Sullivan on the one hand, and Blake, Gates, and Norton on the other. The permit gave Burns the right to cut and remove
 
 for Ms own use;
 
 during the term of 15 years from the date of the permit, all the timber
 
 down and standing,
 
 alive and dead, during said period. It was expressly agreed that time was the essence of this contract, which was upon the express condition second party should pay one-half of all taxes and assessments of every kind whatsoever which should be imposed upon the premises, commencing with the year 1903 and continuing
 
 *421
 
 until the surrender of the license, except as to increased value of any description by reason of improvements made by first party, and should, on or before the 1st day of March of such years, deliver to first party a proper official receipt for one-half of the taxes so imposed on the premises, as well as the timber for each of such years, and a failure to pay such taxes and deliver the receipts taken should be deemed to be a surrender of the license and of all rights thereunder whether at law or in equity and a cancellation or abandonment thereof. It was agreed that all trees covered by the license not removed from the premises during the life of this license should remain the property of the Wilmot Mining Company, its successors and assigns, as fully and absolutely as if the instrument had never been executed. Attention was called to
 
 Hodges
 
 v.
 
 Buell,
 
 134 Mich. 162, and
 
 French
 
 v.
 
 Lumber Co.,
 
 135 Mich. 424, but the court said:
 

 “These cases, and the cases cited and quoted in them, and upon the authority of which they were decided, are all cases in which title to timber was conveyed in terms by deed or contract, with the limitation as to the time of removal, of cases in which land was sold reserving certain' timber to be removed within a certain time, and are distinguishable' from the case at bar, where a license was given ‘to cut and remove for his own use,’ during the period limited, ‘all of the timber,
 
 down and standing,
 
 alive and dead, * * * now on the following described lands.’ Our construction is that under this contract title passed only when the timber was
 
 ‘cut and removed.’
 
 The cases relied upon could have no applicability to the construction of this license, except
 
 when a question arose as to ivhether the timber had been ‘cut and removed’ within the term limited, a question not in this case.”
 

 
 *422
 
 We think it apparent
 
 Scott
 
 v.
 
 Sullivan
 
 was not intended to overrule
 
 Hodges
 
 v.
 
 Buell
 
 and -the cases previously decided by this court, in reliance upon which a vast business was and is financed and carried on. If conflict exists between the rule of
 
 Hodges
 
 v.
 
 Buell
 
 and
 
 Scott
 
 v.
 
 Sullivan,
 
 the former and not the latter should be followed.
 

 December 12, 1905, the Upper Peninsula Land Company, Ltd., gave a timber permit to J. P. Carey, who assigned it to W. S. King, who, January 31, 1914, assigned it to the National Pole Company, which, June 1,1917, deeded to William Bonifas Lumber Company. The conveyance from National Pole Company to William Bonifas Lumber Company was recorded July 18, 1917. Attached to the deed from National Pole Company to William Bonifas, Lumber Company was the original permit issued by the Upper Peninsula Land Company to J. P. Carey, together with the assignment from Carey to King, and the assignment from King to the National Pole Company. The Cloverland Timber Company and the Upper Peninsula Land Company, by an unacknowledged deed dated June 1, 1917, granted an extension of time on the Carey permit to 1924. The Carey-King permit and this extension agreement were attached to the deed of the National Pole Company to William Bonifas Lumber Company and made a part thereof, and recorded July 18, 1917. It is insisted by plaintiffs that these instruments, being unacknowledged, their attachment to the deed of the National Pole Company to William Bonifas Lumber Company and their recording, was a subterfuge, and does not constitute notice under the recording laws. This contention is answered by the provisions of section 11741, 3 Comp. Laws 1915, which provide:
 

 
 *423
 
 “Where any conveyance, with an unacknowledged contract in writing attached, annexed or appended thereto, and referred to in the body of such conveyance as being thereto attached, appended or annexed, has been heretofore recorded, or that may be hereafter recorded, the record, or a transcript of the record of such conveyance and contract, certified by the register in whose office the same may have been recorded, may be read in evidence in any court within this State without further proof thereof; but the effect of such evidence may be rebutted by other competent testimony.”
 

 Plaintiffs rely upon
 
 Kern
 
 v.
 
 Swope,
 
 2 Watts (Pa.), 75, and
 
 McKean & Elk Land Improvement Co.
 
 v.
 
 Mitchell,
 
 35 Pa. St. 269 (78 Am. Dec. 335). Neither case affects the question here involved, or modifies the provision of the statute. These unacknowledged instruments when attached to and made a part of the deed of National Pole Company to William Bonifas Lumber Company, were entitled to record, and, when recorded, constituted notice.
 

 The Upper Peninsula Land Company, Ltd., by conveyance dated May 23, 1911, recorded July 10, 1911, deeded these lands, subject to the Carey permit, to the State Bank' of Chicago. The State Bank of Chicago, by deed dated February 5,1916, recorded December 14, 1918, conveyed these lands to Upper Michigan Land Company, which, on the same day, by deed recorded December 14, 1918, conveyed them to J. J. Hicks, both conveyances being subject to the Carey permit. November 1, 1918, J. J. Hicks and wife conveyed their interest in these lands by quitclaim deed recorded December 23, 1918, to Northern Michigan Land Company without reservations.
 

 Section 11689, 3 Comp. Laws 1915, declares a quitclaim deed “sufficient to pass all the estate which the grantor could lawfully convey by a deed of bar
 
 *424
 
 gain and sale.” And section 11721, 3 Comp. Laws 1915, provides that one may be a good-faith holder under a quitclaim deed, and that a quitclaim deed shall not be of itself notice of prior unrecorded conveyances of the same real estate or any part thereof.
 

 By Act No. 199, Pub. Acts 1915 (3 Comp. Laws 1915, § 11721), the acceptance of a quitclaim deed
 

 ‘ ‘ shall not affect the question of good faith of such subsequent purchaser or be of itself notice to him of any unrecorded conveyance of the same real estate or any part thereof. ’ ’
 

 Except as modified by statute, the. law as above stated remains in force. The quitclaim deed from Hicks to the Northern Michigan Land Company did not exempt the timber permit to Carey. It was not necessary. In the warranty deed of the same date to the Northern Michigan Land Company the property was conveyed by Hicks subject to timber permits of record. This timber permit being of record in connection with the conveyance from the National Pole Company to William Bonif as Lumber Company and excepted in the conveyance by warranty deed from Hicks to the Northern Michigan Land Company, the Northern Michigan Land Company took title and plaintiffs’ predecessors took their mortgages with notice of the existence, contents, and terms of this permit.
 

 The Northern Michigan Land Company, after the extension of the Carey permit by Cloverland Timber Company and Upper Peninsula Land Company, June 1, 1917, on December 1, 1918, but after this property was mortgaged to plaintiffs’ predecessors, accepted a quitclaim deed from Cloverland Timber Company subject to the Carey-King permit, and recorded the same after it recorded the mortgage.
 

 
 *425
 
 The Cloverland Timber Company, December 1, 1918, conveyed the land by quitclaim deed recorded December 1, 1918, subject to the Carey-King permit to the Northern Michigan Land Company. The Northern Michigan Land Company, by reason of the priority of record of the deed from the National Pole Company to William Bonifas Lumber Company, to which the Carey-King permit and its extension was attached, and by reason of the deed from the Cloverland Timber Company and other conveyances in its chain of title, must be held to have had notice of the Carey-King permit and the extension of the same. It mortgaged the premises to Olson and Hartigan, trustees, November 1, 1918, the day it received the conveyance from Hicks and wife. The trustees took the mortgage of this property with knowledge of the rights of William Bonifas Lumber Company under the Carey-King permit and its extension. Whether the William Bonifas Lumber Company had any rights under the extension contract depends upon the authority of Clover-land Timber Company and Upper Michigan Land Company to make the extension agreement of June 1, 1917. At that time the record title to the lands was in the State Bank of Chicago. It had, however, February 5, 1916, deeded this land to the Upper Michigan Land Company, and the Uppér Michigan Land Company had deeded it to Hicks, but these conveyances were not recorded until 1918. The trial court held Hicks had title to this land as trustee for the Cloverland Timber Coriipany. This conclusion is attacked by--plaintiffs; --There 'is nothing in-the deeds to Hicks to establish - that he was a trustee. Section 11575, 3 Comp. Laws 1915, provides that:
 

 “Express trusts may be created * * * for the beneficial interest of any person or persons', -when
 
 *426
 
 such trust is fully expressed and clearly defined upon the face of the instrument creating it.”
 

 Section 11975, 3 Comp. Laws 1915, provides:
 

 “No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter lie created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing. ’ ’
 

 "What constitutes a compliance with sections 11575 and 11975? The rule is thus stated in 1 Perry on Trusts (6th Ed.), § 82:
 

 ‘ ‘ There is no particular formality required or necessary in the creation of a trust. All that is required is written evidence supplying every essential detail of the trust.”
 

 See, also, 39 Cyc. p. 53;
 
 Patton
 
 v.
 
 Chamberlain,
 
 44 Mich. 5;
 
 Nolan
 
 v.
 
 Garrison,
 
 151 Mich. 138;
 
 Woolfitt
 
 v.
 
 Histed,
 
 208 Mich. 308;
 
 Brender
 
 v.
 
 Stratton,
 
 216 Mich. 166 (22 A. L. R. 728).
 

 The Upper Peninsula Land Company, Ltd., deeded these lands to the State Bank of Chicago by warranty deed dated May 23, 1911, and recorded July 10, 1911. The contract executed as a part of this transaction, anlong other things, provided:
 

 * * # said warranty deeds and assignment while absolute in form shall contain an appropriate clause providing that the purchaser shall not be required to look to the application of the purchase money, said instruments are not intended to and shall not create any beneficial interest whatsoever in said Trust Company in, said lands or prop
 
 *427
 
 erty, or any part thereof, and that no part of said property, real or personal, shall ever be of become liable for or be subjected to any of the obligations or liabilities of said Trust Company or the claims of any of its creditors, but said conveyance shall be in trust solely for the following purposes, to wit:” * # *
 

 The entire transaction was to facilitate a sale by the Upper Peninsula Land Company, Ltd., to the Upper Michigan Land Company and Upper Michigan Timber Company. After the bill was filed in this case, Hicks executed a declaration of trust, a copy of which is found in Appendix 4 hereto.
 

 ‘ ‘ The statute of frauds will be satisfied if the trust can be manifested or proved by any subsequent acknowledgment by the trustee, as by an express declaration, or any memorandum to that effect.” 1 Perry on Trusts (6th Ed.), § 82.
 

 If Hicks, while holding title to the land, had made a declaration in writing that he held title in trust, such declaration, being in derogation of title apparently absolute, would have been binding upon him and alone sufficient to establish the trust, but after Hicks divested himself of interest in the property by the execution and delivery of an absolute deed, his subsequent declarations could not ordinarily affect the title apparently conveyed. 1 Perry on Trusts (6th Ed.), §
 
 77; Phillip
 
 v.
 
 South Park Com’rs,
 
 119 Ill. 626 (10 N. E. 230).
 

 The minute book of the Cloverlafid Timber Company shows:
 

 “St. Paul, Minnesota, February 7, 1916.
 

 “As evidence of and in payment for thirty-three thousand (33,000) acres of land this day purchased from the Upper Michigan Land Company by me, I presume to pay to the Upper Michigan Land Company the sum of. one hundred fifty thousand
 
 *428
 
 ($150,000) dollars on or before five (5) years after this date with interest at the rate of five per cent, per annum, payable semi-annually at the office of the Upper Michigan Land Company in the city of St. Paul.
 

 (Signed) “ J. J. Hicks.
 

 “In consideration of the conveyance to the Clover-land Timber Company of the certain thirty-three thousand (33,000) acres of land above referred to which land has first been mortgaged by J. J. Hicks to Ralph O. Olson for the sum of one hundred thousand ($100,000) dollars. Now this is to show that we hereby assume and agree to pay the said mortgage and the ' above agreed sum of one hundred fifty thousand ($150,000) dollars with interest thereon as above specified.
 

 “Cloverland Timber Company,
 

 “By H. II. Hamilton, Chairman,
 

 “By Geo. W. Preston, Secretary.”
 

 (Cloverland Timber
 

 Company seal.)
 

 (Indorsements on back of above Exhibit 3:)
 

 “Indorsed on within note June 30,1916; Int. bonds charged then..........$1,250.00
 

 Indorsed on within note June 30, 1916, Bonds C. T. Co;...................... 46,077.32
 

 Indorsed on within note June 30, 1916, Bonds C. T. Co:...................... 24,111.37
 

 $71,438.69
 

 Contract note to 1087.
 

 Contract 1087.
 

 50c on 76307 with $62,265.15 ,
 

 Note No. 3.
 

 Bal. due $78,561.31.”
 

 The minute book of the Cloverland Timber Company under date of February 18, 1916, show’s it took action as follows:
 

 “Minutes of special meeting of the board of directors of the Cloverland Timber Company held at
 
 *429
 
 the office of said company in the Gillfillan block in the city of St. Paul on Friday the 18th day of February, A. D. 1916, at 2:30 o’clock in the afternoon of said date.
 

 “Present: J. J. Hicks, president of said corporation, and H. H. Hamilton and Geo. W. Preston. The meeting was called to order by J. J. Hicks, president of the said corporation. The minutes of the meeting of the stockholders of this corporation held on the date at 2 o’clock were read and approved.
 

 “Upon motion of Geo. W. Preston it was resolved that this corporation mortgage all lands owned by said corporation in the State of Michigan, consisting of approximately 100,000 acres to secure payment of negotiable notes of this corporation accruing in amount three hundred twenty-nine thousand dollars ($329,000) issued and payable to the order of the Upper Michigan Land Company, said notes to be delivered as payment of part of the purchase price of said real estate and in addition thereto that this corporation assume the payment of the balance due Mr. William G. Mather, trustee for the Upper Peninsula. Land Company, Ltd., on- the indebtedness of the Upper Michigan Timber Company and the Upper Michigan Land Company remaining unpaid as evidenced by the notes of said companies still unpaid bearing date January 3, 1911, amounting approximately to the sum of two hundred eighty-five thousand dollars ($285,000), and
 

 “It is further resolved that the mortgage to secure said notes be in the form of an agreement executed by the Upper Peninsula Land Company, Ltd., the Upper Michigan Land Company, the State Bank of Chicago, as trustees, and said Cloverland Timber Company, the form of which agreement has been duly approved by the officers of said Upper Peninsula Land Company, Ltd., said Upper Michigan Land Company and said State Bank of Chicago, and each page of said agreement bears the auto-graphic signature of the initials of W-. P. Belden, and
 

 
 *430
 
 “Be it further resolved that the president and secretary of this company be and they hereby are authorized to execute said agreement on behalf of this corporation, and the president and treasurer of this corporation be authorized to execute the promissory notes aforesaid aggregating in amount three hundred twenty-nine thousand ($329,000) dollars.
 

 “There being no further business said meeting adjourned.
 

 “Geo. W. Preston, Secretary.
 

 “The foregoing minutes read and approved:
 

 ti
 
 T T TTrr'Trc:
 

 “H. H. Hamilton. (Seal).”
 

 The Upper Michigan Land Company conveyed 33,000 acres of land to Hicks, who mortgaged it to Olson for $100,000. On the same day the Clover-land Timber Company assumed and agreed to indemnify Hicks and pay his $100,000 mortgage. Eleven days later the Cloverland Timber Company voted to mortgage all of its lands in Michigan, including those transferred to and mortgaged by Hicks to Olson; and Hicks, as its president, signed and approved the minutes of this corporate meeting, thus acknowledging the land really belonged to the Cloverland Timber Company.
 

 It is shown by parol proof, beyond question, that Hicks was acting as agent or trustee in mortgaging the property. It was transferred to him to be mortgaged to raise money to make payments to the vendors. It was mortgaged. The Cloverland Timber Company assumed and agreed to pay the mortgage. It was paid. The entire transaction was carried out and performed. It was not invalid, and after performance the statute of frauds is not ordinarily so material.
 
 De Moss
 
 v. Robinson, 46 Mich. 62 (41 Am. Rep. 144);
 
 Wildey
 
 v.
 
 Crane,
 
 69 Mich. 17;
 
 Bennett
 
 v.
 
 Knowles,
 
 111 Mich. 226;
 
 Gerber
 
 v.
 
 Upton,
 
 123
 
 *431
 
 Mich. 605;
 
 Michigan Cent. R. Co.
 
 v.
 
 Chicago, etc., R. Co.,
 
 132 Mich. 324.
 

 The mortgage of November 1, 1918, provided:
 

 “These lands are deeded subject to all reservations of record such as easements for public roads, railroad rights of way, mineral reservations, timber permits, including also the timber permits which may be unrecorded but which are filed in the office of the trustees herein, on part of the above described land.”
 

 The mortgage of September 1, 1919, excepts “such reservations as are shown in the schedule of lands hereto attached and such as now appear in the mortgagor’s chain of title.”
 

 There is no doubt as to the nature of Hicks’ holding, as found by the trial court.
 

 The Cadillac Lumber & Chemical Company purchased approximately 2,560 acres of land and timber of mortgagor after execution of the second mortgage. Its rights do not all stand on the same footing. As to five 40’s on sections 3, 26, and 27 it owns the fee. About this there is no controversy. It acquired rights from the Northern Michigan Land Company by timber permits of which the Northern Michigan Land Company was the owner, and the second trust mortgage did not attach thereto, although the lands are described in the mortgage. The mortgagor had no title to pledge to the mortgagee. As to the lands on sections 12, 13, and 14 and 24, the fee was never vested in mortgagor.' It acquired a timber permit which it conveyed to the Cadillac Lumber & Chemical Company. The Cadillac Lumber & Chemical Company acquired timber permits on lands acquired from Chambers-Rhoades. The mortgagor acquired these lands subject to an outstanding timber permit to Chambers-Rhoades au
 
 *432
 
 thorizing removal of the timber therefrom up to April 1, 1924. The Cadillac Lumber & Chemical Company stands in place of Chambers-Rhoades. The controversy between the Cadillac Lumber & Chemical Company and plaintiffs concerns 43 40’s, and as to these it is claimed by Cadillac Lumber & Chemical Company that it is a purchaser in good faith, for a valuable consideration; that it paid all the mortgage required it to pay; and, if the court holds against it upon this claim, it is its claim that it is entitled to pay the balance due up to the amount required by the deed to release said lands and receive a valid conveyance thereof. Plaintiffs do not question the Cadillac Lumber
 
 &
 
 Chemical Company’s prior rights to the timber on the north half of the N. E. % of section 19, and the north half of the N. W. % of section 20, in town 43 north, range 1 west. They concede the Cadillac Lumber & Chemical Company acquired the right to cut and remove timber from the lands located on section 34, town 43 north, range 2 west, up to April 21, 1924, from ChambersRhoades, whose rights were superior to the lien of plaintiffs under the trust mortgage. Plaintiffs allege the issue is narrowed to the two timber permits of June 7,1920, and February 18, 1921. Included in these permits are the lands on sections 12, 13, 14, and 24 in town 43 north, range 2. west, the title to which lands was in the State Bank of Chicago in trust.
 

 Witness Kirchmaier testified:
 

 “The State Bank of Chicago conveyed title to the timber'in sections 12, 13, 14; and 24'in township 43 north, range 2 west, to the Cloverland Timber Company, and the Cloverland Timber Company then conveyed it to the Northern Michigan Land Company. That was done after the negotiation with the
 
 *433
 
 Cadillac Lumber & Chemical Company had begun. The expiration of the timber permit acquired by the Northern Michigan Land Company from the Clover-land Timber Company, is April 1,1940. That would expire the same date as the arrangement that I made. The transaction started with the sale to the Cadillac Lumber & Chemical Company. The first paper issued was the permit from the Northern Michigan Land Company to the Cadillac Lumber & Chemical Company. It was then discovered that the title to this timber was still in the State Bank of Chicago. The bank refused-to convey to anyone but the Cloverland Timber Company, for whom they held the timber in trust. Upon the receipt .of that conveyance, the Cloverland Timber Company issued a permit to the Northern Michigan Land Company, and that was the order in which they were executed and delivered.” . •
 

 And on cross-examination he testified:
 

 “Whatever interest the Northern Michigan Land Company had in these lands or timber was merged in the trust deed only by accident. ’ *
 

 The Northern Michigan Land Company sold timber on land to which it had no title. Its mortgage of this land to the trustees conveyed no title to them. It subsequently sold the timber on these lands to the Cadillac Lumber & Chemical Company for a valuable consideration. The sale of standing timber on lands is not valid where the party selling it has no title and acquires none.
 

 In
 
 Donohue
 
 v.
 
 Vosper,
 
 189 Mich. 78, 88, it is said:
 

 “The rule is-that a grantor who assumes-'to convey property by warranty deed when the title is in a third person will, together with his subsequent grantees with notice, be estopped from setting up against the first grantee an after-acquired title. The American courts' have uniformly held that the after-ac
 
 *434
 
 quired estate passes by direct operation of law, without the intervention of any court or the aid of a suit in equity or action at law on the covenants, to the Covenantee. * * * This doctrine has received the approbation of this court.
 
 Lee
 
 v.
 
 Clary,
 
 38 Mich. 223, 226;
 
 Fisher
 
 v.
 
 Hallock,
 
 50 Mich. 463, 465;
 
 Pfirrman
 
 v.
 
 Wattles,
 
 86 Mich. 254, 258.”
 

 In
 
 McQuillan
 
 v.
 
 Ayer,
 
 189 Mich. 566, it is said:
 

 “A conveyance by the trustee ordinarily effects a complete transfer of the beneficial as well as the legal estate.
 
 Thatcher
 
 v.
 
 St. Andrew’s Church,
 
 37 Mich. 264.”
 

 In 39 Cyc. p. 376, it is said:
 

 “A purchaser from a trustee possessing a discretionary power of sale is not bound to inquire if the power has been properly exercised.”
 

 Section 11585, 3 Comp. Laws 1915, provides:
 

 “When the trust shall be expressed in the instrument creating the estate, every sale, conveyance, or other act of the trustees, in contravention of the trust, shall be absolutely void. ’ ’
 

 Section 11586, 3 Comp. Laws 1915, provides:
 

 “No person who shall actually and in good faith make any payment to a trustee, which the trustee as such is authorized to receive, shall be responsible for the application thereof according to the trust; nor shall any right or title derived by such person from the trustee, in consideration of such payment, be impeached or called in question, in consequence of any misapplication of such payment by the trustee.”
 

 In
 
 Pierce
 
 v.
 
 Grimley,
 
 77 Mich. 273, 280, it is said:
 

 “Where the trust appears on the face of a deed, it is notice to every one of the trustee’s character and duties; and it is declared by statute that every deed
 
 *435
 
 in violation of such a trust shall be held absolutely void. ’
 
 ’■
 

 The Cadillac ^Lumber & Chemical Company is charged with notice of whatever the record showed as to the terms and conditions of the mortgages.
 

 In
 
 Fitzhugh
 
 v.
 
 Barnard,
 
 12 Mich. 104, 110, it is said:
 

 “It is a well-settled principle of law, that a grantee is chargeable with notice of whatever appears in the chain of title through which he claims.”
 

 In
 
 Jones
 
 v.
 
 Harsha,
 
 225 Mich. 416, 423, it is said:
 

 ‘ ‘ The duty of a vendee or mortgagee of trust property to see to it that the money paid to the trustee is used for the purpose for which the sale or loan is made under the terms of the will, if expressly stated therein, is discussed at considerable length in 26 N. C. L. pp. 1294, 1295, and in 39 Cyc. p. 386, and cases cited. In the former it is said:
 

 “ ‘In many jurisdictions the doctrine requiring purchasers from trustees to look to the application of the moneys paid by them has been expunged by statute. ’
 

 “This State is among the number. Section 11586, 3 Comp. Laws 1915, provides:
 

 “ ‘No person who shall actually and in good faith make any payment to a trustee, which the trustee as such is authorized to receive, shall be responsible for the application thereof according to the trust; nor shall any right or title derived by such perspn from the trustee, in consideration of such payment, be impeached or called in question, in consequence of any misapplication of such payment by the trustee. ’
 

 “New York had a similar statute at the time it was here enacted. (Consolidated Laws of New York, vol. 4, p. 4993.) In a note to this section it is said:
 

 “ ‘ A
 
 bona fide
 
 purchaser in good faith from a trustee will be protected regardless of the disposition of the funds by the trustee. ’ ’ ’
 

 
 *436
 
 If the controversy arose here between others than purchasers from the mortgagor itself, the express authorization of the mortgage that the trustees thereunder might employ agents and attorneys and that Kirchmaier, the secretary of the mortgagor and agent of the trustees, presented timber permits properly executed by the mortgagor and approved and signed by the trustees, which timber permits contained releases, might be sufficient to protect the subsequent purchasers thereunder, and to protect the Cadillac Lumber & Chemical Company.
 
 Day
 
 v.
 
 Brenton,
 
 102 Iowa, 482 (71 N. W. 538, 63 Am. St. Rep. 460);
 
 Williams
 
 v.
 
 Jackson,
 
 107 U. S. 478 (2 Sup. Ct. 814).
 

 Here the question is not one of a subsequent purchaser relying upon the record. It is one where a purchaser from a mortgagor, with the approval of the trustees in a mortgage, is bound to know the terms and conditions of the sale and approval by the trustees from the trust mortgage in his chain of title, and the purchaser, under such circumstances, must be held to pay the purchase price provided in the trust conveyance in accordance with its terms.
 

 The Cadillac Lumber & Chemical Company claims-that, if not correct in its other contentions, it is, under the circumstances, entitled to pay the balance due according to the terms and conditions of the mortgage, and to take conveyance of the property purchased by it. It paid mortgagor $26,000, and, in. addition, paid taxes and expenses, making a total of $26,974.40. It filed a bond herein to secure the payment to mortgagor of $14,400, being the additional amount required to release, at the price stipulated in the mortgage, the property purchased by it, and demanded a release from the mortgagor and trustees of these lands. ' The trial court held that
 
 *437
 
 it was entitled to such release. Plaintiffs contend the Cadillac Lumber & Chemical Company is not entitled to such relief. Since reargument we have been favored by plaintiffs with an exhaustive brief insisting the trial court misapplied the rule of
 
 Taylor
 
 v.
 
 Carter,
 
 211 Mich. 365, aiid if the trial court did not misapply the rule of that case, it is wrong and should be reversed. The question must be determined by the law of Michigan.
 

 In
 
 Taylor
 
 v.
 
 Carter, supra,
 
 it is said:
 

 “The covenants of the mortgage by its terms extended to the assigns of the parties; this included defendant.
 
 Erichsen
 
 v.
 
 Tapert,
 
 172 Mich. 457. In
 
 Vawter
 
 v.
 
 Crafts,
 
 41 Minn. 14 (42 N. W. 483), a case cited with approval by this court in
 
 Commercial Bank
 
 v.
 
 Hiller,
 
 106 Mich. 118, it was held that covenants such as we have under consideration run with the land.”
 

 The court held the question of the right to a partial release of the mortgaged premises had been foreclosed-by the former decisions of the court, citing
 
 Nims
 
 v.
 
 Vaughn,
 
 40 Mich. 356;
 
 Commercial Bank
 
 v.
 
 Hiller,
 
 106 Mich. 118;
 
 Vawter
 
 v.
 
 Crafts,
 
 41 Minn. 14 (42 N. W. 483).
 

 It is settled under- the law of this State that a covenant for partial release runs with the land and is enforceable, although it does not by its -terms expressly confer the right to those claiming under the mortgagor. It is contended that such a right to partial release of the premises cannot be exercised because it constitutes a right given by the mortgagor and the mortgagor is in default.
 

 In 41 C. J. p. 828, § 1000, it is said
 

 “While ordinarily the privilege to require a partial release should be exercised before default, and, if not, the right may be lost, the question depends
 
 *438
 
 upon the construction of the release clause in each particular case.”
 

 Here again there is a conflict of authority and the question arises as to the rule in this State.
 

 In
 
 Nims
 
 v.
 
 Vaughn,
 
 40 Mich. 356, a mortgage contained a clause that the mortgagee was to release the first three city lots sold by the mortgagor. The dispute arose between the mortgagor and the mortgagee as to whether or not this mortgage was usurious. Foreclosure proceedings were instituted. Decree' of foreclosure of the circuit court was affirmed by this court.
 
 Vaughn
 
 v.
 
 Nims,
 
 36 Mich. 297.
 

 After this a separate suit was instituted to compel a release of the three lots. Various defenses were interposed. The court held the mortgagor was entitled to the partial release even after decree of foreclosure rendered and affirmed by this court.
 

 In
 
 Taylor
 
 v.
 
 Carter,
 
 211 Mich. 365, the right to a partial release was insisted on, in foreclosure proceedings, after default.
 

 In
 
 Commercial Bank
 
 v.
 
 Hiller,
 
 106 Mich. 118, 120, it is said:
 

 “The undertaking is absolute, and not limited as to time, but, on the contrary, the contract is to release at such time or times as the mortgagor or his assigns or grantees may request. ’ ’
 

 These cases involve the construction of language substantially similar to that involved here, and the conclusion is inevitable that the right to a partial release upon compliance with the conditions of the mortgage exists in the successors to the title of the mortgagor even after default.
 

 The trial court found the conveyances to the Cadillac Lumber & Chemical Company under the timber permit of June 7, 1920, expiring on April 1, 1940, on
 
 *439
 
 sections 19,20, 21, and 28 in township 43 north, range 1 west, and on section 35 in township 43 north, range 2 west, were subordinate to the lien of the trust deeds; that such lands had not been released from the land of trustees ’ deed by any valid and binding acts by the trustees for the bondholders; that plaintiffs could lawfully assert their rights against such lands under the trust deeds, and that the Cadillac Lumber & Chemical Company could obtain a release of such lands from the trust deeds upon payment of $6 an acre; that the timber permit to the Cadillac Lumber & Chemical Company of the same date and expiring at the same time covering lands on sections 12, 13, 14, and 24 in township 43 north, range 2 west, was in the same position, but that defendants were entitled to a release of such lands on the payment of $4 an acre; that the permit to the Cadillac Lumber & Chemical Company, dated February 18, 1921, expiring April 1,1940, covering the lands on section 34 in township 43 north, range 2 west, was in the same position, and might be retained by the Cadillac Lumber & Chemical Company upon the payment of $4 an acre. Plaintiffs, in their brief, concede the right of the Cadillac Lumber & Chemical Company to cut and remove the timber from the lands above described on section 34 in township 43 north, range 2 west, up to April 1, 1924, such right being superior to the right of the trust mortgages to plaintiffs. The decree of the trial court should be modified in accordance with such concession.
 

 The Embury-Martin Lumber Company obtained from the Northern Michigan Land Company a timber permit expiring April 1, 1930, covering lot 5, or the southeast fractional quarter of the southwest quarter of section 19, township 42 north, range 5 west. The permit was sent to the First National Bank of Cheboygan for delivery and collection and
 
 *440
 
 was taken up and paid for by the Embury-Martin Lumber Company. The purchase was made through Mr. Kirchmaier, secretary of the Northern Michigan Land Company, and agent of the trustees under the trust mortgages. He represented at the time, and testified on the trial, the trustees, under the trust mortgages, had been paid for the release of this land. The trial court held the land was not released; that the Embury-Martin Lumber Company was entitled to a release on payment to plaintiffs herein of $4 an acre for 40 acres. The Embury-Martin Lumber Company elected, after -the decree was rendered in the trial court, to take such release and to pay therefor $160. The decree should be affirmed as to this defendant.
 

 November 6, 1920, the Northern Michigan Land Company executed a timber permit to J. M. Kirchmaier, expiring April 1,1940, covering lands on sections 13 and 18 in township 43 north, range 6 west. It was approved and signed by the trustees, paid for by Kirchmaier, acknowledged, and recorded. November 6, 1920, the Northern Michigan Land Company executed to J. M. Kirchmaier another timber permit expiring April 1, 1940, covering lands on sections 19, 20, 21, 29, 30, and 31 in township 43 north, range 6 west, and on sections 24, 25, and 36 in township 43 north, range 7 west. November 6, 1920, the Northern Michigan Land Company also executed to Kirchmaier a timber permit expiring April 1, 1940, covering lands on sections 27, 28, 34, and 35 in township 43 north, range 6 west. All of these permits' executed by the corporation were, approved by the trustees under the trust mortgages. These three permits cover in all approximately 3,240 acres of land. It required $4 per acre to procure its release or $12,960. It is conceded Kirchmaier paid
 
 *441
 
 but $2 an acre to the trustees to procure the releases of this land. The trustees, predecessors to plaintiffs, having approved and signed the releases, and received and kept the $2 an acre which the plaintiffs have not offered to return to purchasers, have, regardless of the other questions involved, elected to ratify the transaction, and not to rescind it. There has been no attempt to place the purchasers who parted with their $6,480
 
 in statu quo
 
 by returning to them the money paid. The purchasers of this timber, under these timber permits, elected to pay the balance of the purchase price which had not been paid by Kirchmaier to the trustees. Plaintiffs appealed. Defendant did not appeal but insists tbe appeal taken by plaintiffs from the decree of the trial court should, as to them, be dismissed. We think it is correct in this contention.
 

 The- Northern Michigan Land Company granted to Jackson
 
 &
 
 Tindle, Inc., by timber permit dated July 19, 1920, the right to cut and remove timber prior to April 1, 1928, from the lands described therein in Mackinac county. This timber permit was approved and signed by the trustees under the trust mortgage March 17, 1920. It covered approximately 760 acres of land, the price of which was fixed at $6 an acre, and 320 acres of land, the price of which was fixed at $4 an acre. The deal was handled through Mr. Kirchmaier, who received $3,500, or more than enough to pay the trustees for the full value of the land. Jackson
 
 &
 
 Tindle, Inc., were within the provisions of section 11586, 3 Comp. Laws 1915. As to it the decree should be affirmed.
 

 The Goodman Cedar Company, by deed dated January 7, 1916, acquired title to all or any part of the merchantable timber lying, standing, or being upon the lands described therein, together with the
 
 *442
 
 right to enter thereon and cnt and remove the timber at any time prior to the 1st day of April, 1924, upon condition it paid the taxes in accordance with the deed. The
 
 habendum
 
 clause of the deed provided:
 

 “To have and to hold said timber until the said first day of April, 1924, unto said party of the second part and its assigns,
 
 provided however, that all timber standing on said lands on the first day of April, 1924, shall be and become the property of the first parties as their respective interests may appear.
 

 It was further provided that second party or its assigns should not have or retain any right to any of the timber on any of the lands described in said deed that should not be cut and removed from said lands prior to the 1st day of April, 1924. It further provided that in event any of said timber was not removed before said date, the first party or its assigns relinquished all claims to the same.
 

 It is insisted that plaintiffs are mortgagees and cannot assert any right of reverter, and there is an exhaustive discussion of
 
 Halpin
 
 v.
 
 School District,
 
 224 Mich. 308. At an early date the legislature attempted, by the adoption of chapter 62, Revised Statutes of 1846, chapter 220, 3 Comp. Laws 1915, to simplify the law of real estate. Since then a reversion is an existing estate in land. It may be temporarily incumbered by later rights, upon the determination of which the original right stands unincumbered. The statute divides estates in expectancy into future estates and reversions.
 

 “A reversion is the residue of an estate left in the grantor or his heirs, or in the heirs of a testator, commencing in. possession on the determination of a particular estate granted or devised.” 3 Comp. Laws 1915, § 11530.
 

 
 *443
 
 A reversion being an existing estate incumbered by later rights, is descendible, devisable, and alienable, the same as estates in possession. 3 Comp. Laws 1915, § 11553.
 

 In
 
 Hatpin
 
 v.
 
 School District,
 
 a reversion was not involved. At the time grantor conveyed to the school district, whether a reversionary estate would ever exist depended upon a contingency. Here the rights of the grantee were limited. They must be exercised before a particular date. A limitation will necessarily determine the estate; a condition may defeat an estate. 1 Sheppard’s Touchstone, 117, 118. In
 
 Halpin
 
 v.
 
 School District
 
 there was a possibility of reverter. The court held, not that a reversion was not alienable, but that the possibility of reverter was not alienable. A reversion might be created, but until the happening of the contingency, a mere possibility was not an estate in lands.
 

 Plaintiffs claim the logs and forest products cut from standing timber on the lands conveyed by this deed reverted on April 1, 1924, the logs having been stored on some of the lands described in the deed, although not upon the particular descriptions upon which the timber stood and from which it had been removed.
 

 The Northern Michigan Land Company has not claimed it is entitled to this property. Plaintiffs’ claim at most could be only a lien thereon. If the property was subject to the mortgage, plaintiffs could raise the question to protect their security from impairment. The timber cut from the land before the expiration of the time limited for its being cut and removed was, under the rule of
 
 Hodges
 
 v.
 
 Buell,
 
 134 Mich. 162, personal property. Neither mortgage under which plaintiffs claim covers personal property owned or after-acquired except as
 
 *444
 
 specified in the first mortgage. The timber which had been cut from the premises and stored for shipment was cut and removed within the meaning of this deed.
 
 Hodges
 
 v.
 
 Buell, supra; Austin
 
 v.
 
 Brown,
 
 191 N. C. 624 (132 S. E. 661). The alleged right of reverter in
 
 Gamble
 
 v.
 
 Gates, 92
 
 Mich. 510, was based upon the provisions of a written contract retaining title to the timber until the purchase price evidenced by promissory notes was paid in full. The title did not revert — it never passed.
 

 We think the timber under this deed was so far cut and removed from the premises upon which it stood as not to be affected by the doctrine governing estates in reversion, that it was personal property, and, as such, the title thereto was vested in the purchasers thereof.
 
 Williams
 
 v.
 
 Flood,
 
 63 Mich. 487;
 
 Macomber
 
 v.
 
 Railroad Co.,
 
 108 Mich. 491 (32 L. R. A. 102, 62 Am. St. Rep. 713);
 
 Hodges
 
 v.
 
 Buell, supra; Austin
 
 v.
 
 Brown, supra.
 

 We think the decree of the trial court as to the Cadillac Lumber & Chemical Company should be modified as above indicated as to the lands inadvertently included therein. That the timber of the Goodman Cedar Company and affiliated defendants cut and held for shipment on the banking ground was personal property, though not actually shipped until after April 1,1924, and that, except as to these modifications, the decree of the trial court should be affirmed, with costs of this court to appellees and cross-appellants, Cadillac Lumber & Chemical Company and Goodman Cedar Company and associated defendants.
 

 North, Fellows, Wiest, Clark, McDonald, and Sharpe, JJ., concurred. Fead, C. J., did not sit.
 

 
 *445
 
 Appendix 1.
 

 It is understood, as hereinbefore set forth that this mortgage or trust deed is given for the purpose of obtaining funds for the refundment of secured obligations and other requirements of the mortgagor and that portions of the lands covered by this trust deed as shown by the abstracts of title furnished to the trustees herein, are subject to certain mortgage liens and portions of the contracts and mortgages to be pledged hereunder are held as collateral to secure prior obligations of the company, and the mortgagor hereby covenants that the funds furnished from the proceeds of the sale of bonds shall be first applied to the extinguishment and payment of such liens on said lands and' other secured obligations and that the trustees shall certify bonds hereunder, when and as the land herein is released of prior liens, on the basis of four ($4) dollars per acre, provided, however, that when and after all the collateral described in this trust deed is turned over to the trustees, then bonds shall be certified by the trustees on the basis of five ($5) dollars per acre for all land described herein that is released of all prior liens.
 

 The unsold land above described may be released at any time in units of not less than forty (40) acres or government lots upon a cash payment to said trustees of six and 25/100 ($6.25) dollars per acre. All payments so made shall be applied upon the redemption of the bonds first maturing hereunder as hereinbefore provided.
 

 - The mortgagor may sell any part of said lands upon contract provided the contract and notes be deposited with the trustees as collateral under this indenture and that the balance unpaid when deposited, under any contract be not less than six and 25/100 ($6.25) dollars per acre.
 

 The mortgagor may sell any part of said lands and take mortgage back, provided said mortgage and notes be deposited with the trustees as additional collateral under this indenture 'and provided the balance unpaid under any mortgage be not less than six and 25/100 ($6.25) dollars per acre and the trustees will in that event release or deed the land to the mortgagor.
 

 It is understood that any cash or property received by the mortgagor above the contracts or mortgages so deposited, which is not to be less than the six and 25/100 ($6.25) dollars per acre unpaid balance, may be retained by the mortgagor and it shall not be called upon to account therefor to the trustees.
 

 The mortgagor is authorized to sell any of these lands by exchange of property provided that no encumbered property be taken in exchange and the trustees may deed any part of the land herein described and receive a deed to the exchanged properties provided the trustees are satisfied that in their judgment, the property taken in exchange is ample to protect the bondholders and the trustees shall hold the exchanged property until it is sold by the mortgagor and give an unconditional release when the sum of six and 25/100 ($6.25) dollars per acre on the lands released under this indenture for the purpose of the exchange is paid to said trustees in cash.
 

 
 *446
 
 It is understood that as fast as the lands are sold and contracts or mortgages are taken- hack, that they will be deposited with the trustees until the total principal balance unpaid on said contracts or mortgages equals amount of the outstanding bonds.
 

 It is understood that the principal sum, last above referred to, shall be held as collateral for the bonds and that the interest accruing on the same shall be deposited in the sinking fund to be used to pay interest on the bonds, taxes, insurance premiums, trustees’ fees and other incidental expenses in connection with this bond issue.
 

 These lands are deeded subject to all reservations of record such as easements for public roads, railroad rights of way, mineral reservations, timber permits, including also the timber permits which may be unrecorded but which are filed in the office of the trustees herein, on part of the above described land.
 

 Appendix 2.
 

 The trustees shall at any time upon the written request of the company, signed by the president or vice-president and under its corporate seal, attested by its secretary, release in units of 40 acres or multiples thereof from the lien of this trust deed, any of the lands hereinbefore described, upon payment to the trustees of the sum of four dollars ($4) in cash per acre for any lands so sought to be released, with the further provisions that lands hereinbefore listed and denominated as “timber lands” (Schedule B and part of D) shall not be released except upon payment to the trustees of the sum of six dollars ($6) in cash per acre for the lands so sought to be released, but provided further that at such time as the company shall have paid in for the release of “timber lands” not less than one hundred twenty thousand dollars ($120,000) in cash in excess of the four dollars ($4) per acre required for the release of the land itself, the company shall thereafter be entitled to have a release in 40-acre units of any and all its lands still remaining under the lien of the trust deed, upon a basis of payment to the trustees of four dollar's ($4) per acre, without reference to whether said lands are hereinbefore denominated as “timber lands” or not.
 

 The company shall also be entitled to have from the trustees a release of lands from the lien of this deed of trust upon payment to the trustees of two dollars ($2) in cash per acre, provided the lands so released have been sold by the company for an amount of not less than five dollars ($5) per acre, and provided the company shall deliver to the trustees purchase money mortgages duly and properly executed by the purchaser or purchasers of such lands together with the notes evidencing the entire balance due upon such purchase money mortgages all duly assigned to the trustees and provided there is no other or prior underlying lien or incumbrance ahead of such purchase money mortgage and provided there shall be due and payable upon such purchase money mortgage indebtedness not less than the sum of two dollars ($2) per acre of the lands so released, together with interest thereon not less than four years from the date of such mortgage. Upon the payment to the trustees of said last
 
 *447
 
 mentioned sum of two dollars ($2) per aere of the lands so released in any individual ease, together with interest thereon at or before the time the same becomes due under the terms, of such purchase money mortgage, the trustees shall reassign said purchase money mortgage, together with the balance of the indebtedness, if any, secured thereby, to the company and any and all further lien, right, title and interest of the trustees, or of the holders of any of the bonds hereby accrued, thereto shall cease and determine, and the company or its successors or assigns hereby guarantees unto the trustees and the holders of any and all bonds issued hereunder, the prompt and punctual payment of any amounts both principal and interest that may be due upon any mortgage note or contract or other evidence of indebtedness whieh may be assigned and delivered to the trustees as security for the balance of the amount required to obtain the release of lands as hereinabove provided and upon the failure of the person or persons primarily indebted upon any such note, mortgage or contract, the company will promptly pay to the trustees any such sum so in default to an amount sufficient so that the trustees shall have received the full amount of four ($4) or six ($6) dollars per acre for the release of lands as hereinbefore provided together with interest thereon.
 

 Any and all moneys paid to the trustees for the purpose of securing the release of lands under the terms and provisions of the two last preceding paragraphs of this trust deed, together with any note, mortgage or contract delivered to the trustees as security for the balance due for or upon any released lands, shall be held by the trustees as a sinking fund for the sole and exclusive use and purpose of paying the principal upon the bonds secured hereby not including any interest which may be due thereon, provided, however, that should the company desire to call any or all of the bonds issued and outstanding at any time under the terms of this trust deed, any funds in the hands of the trustees in the sinking fund hereby created, may be available to the company for the purpose of taking up bonds so-called for redemption by the company.
 

 Appendix 3.
 

 PERMIT TO OUT TIMBER
 

 Northern Michigan Land Company.
 

 December 1,®1920.
 

 Received of M. E. Aldrich, Hiawatha, Michigan, six hundred and no-100 ($600.00) dollars, for and in consideration of whieh the Northern Michigan Land Company, a corporation, existing and doing business under and by virtue of the laws of the State of Michigan, hereby grants to said M. E. Aldrich the right to cut and remove prior to April 1, 1926, all of the merchantable timber now standing or being upon the following described lands, in the county of Schoolcraft and State of Michigan, to wit:
 

 Northwest quarter (N. W. 14); northwest quarter of southwest quarter (N. W. 14 of S. W. 14); west half of northeast quarter (W.
 
 Yz
 
 of N. E. 14) and northwest quarter of southeast quarter
 
 *448
 
 (N. W. % of S. E. %) of section 1-45-16; also northeast quarter of northeast quarter (N. E. % of N. E. %), east one-half of northwest fourth and the southwest fourth of the southwest fourth and the east half of the southwest fourth of section 30, township 45, range sixteen west, also southwest fourth of southwest fourth of section one and northwest fourth of the southwest fourth and the southeast fourth of the northeast fourth of section two, township 44 north, range 17 west.
 

 Upon condition, however, that the licensee, or legal holder, of this permit shall pay to said Northern Michigan Land Company, all taxes and assessments that may be levied or assessed against the lands in this permit described, together with collection fees thereon which the timber company may have to pay for the years 1920, 1921, 1922, 1923, 1924.
 

 Said timber company shall as soon as convenient after December 1st of each year, mail to the licensee, or legal holder, of this permit, directed to the last known address of sueh, a statement of the taxes, assessments and collection fees against the above described premises for said year, and said licensee or legal holder, of this permit shall, within five days after the mailing of said statement, pay-to the said timber company, at its office, the full amount of sueh taxes, assessments and collection fees that the timber company may have to pay on account of the lands above described.. And, in the event that the licensee, or legal holder, of this permit, shall fail, neglect or refuse to pay sueh taxes, assessments and collection fees before the expiration of fifteen days after the date of mailing such statement, then all the rights of the said licensee, or legal holder of this permit to cut and remove the timber on the lands above described, and in, to and under this license or permit, shall, without further notice to the said licensee, or legal holder, be forfeited to said timber company, as liquidated damages hereby fixed and determined for such failure or refusal; and all of the rights of the licensee, or legal holder, under said permit or license, shall thereupon cease and determine; it being expressly understood and agreed that the prompt payment of the taxes and assessments, together with collection fees as aforesaid, within five days after the mailing of said notice, is a condition precedent to the right of the licensee, or legal holder, of this permit to exercise the rights and privileges herein and hereby granted.
 

 It is further expressly agreed that the said timber company shall have the right, at any time on and after the .... day of ......, 19....,, to require said licensee, or legal holder, to deposit with said timber company the sum of $...., to be held as security for the payment by said licensee, or legal holder, of all taxes thereafter to become due and payable under the terms of this permit. Eailure to make such deposit within fifteen days after receiving written notice from said timber company asking for such deposit shall be deemed a forfeiture of all the rights and privileges of said licensee, or legal holder, under the terms of this permit.
 

 It is expressly agreed that this permit to cut and remove timber from the above described premises is a license and privilege personal to said licensee, or legal holder, and that the same shall not be transferred or assigned in whole or in part without the
 
 *449
 
 written consent of said timber company, and that in such ease such assignment is consented to, said licensee, or legal holder, shall not thereby be relieved from the performance of any of the obligations hereby assumed.
 

 Said licensee, or legal holder, shall not have or retain any right to any of the said timber first above described, that shall not be removed from said land prior to the said April 1st, 1926, time being of the essence hereof; and in the event that any of the said timber is not removed from said lands before the said date, said licensee, or legal holder, hereby relinquishes all claims to the same.
 

 It is further understood and agreed that the licensee, or legal holder, of this permit, shall, during its continuance, comply with and perform all of the requirements of the laws of the State of Michigan, now in force or which may hereafter be enacted for the preservation of the forest and the prevention of forest fires, and pay any and all charges and assessments whieh may be imposed for violating the provisions of such laws.
 

 Nothing herein contained shall be held or construed to prevent the owners of the lands above described from selling same or any part thereof (reserving the aforesaid timber) during the time limited for the removal of said timber.
 

 Northern Michigan Land Company, By C. A. MoCann, President.
 

 Attest:
 

 M. A. Jennings, Ass’t. See’y.
 

 The above permit is hereby accepted, and the terms and conditions thereof agreed to as of the date first above written.
 

 Melvin E. Aldrich.
 

 Appendix 4.
 

 Know all men by these presents that I, Josiah J. Hicks, sometimes known as J. J. Hicks, of the city of St. Cloud, in the State of Minnesota, do hereby state and declare that certain lands in the State of Michigan, being those more fully described in a certain deed to me dated February 5, 1916, recorded on December 14, 1918, in the office of the register of deeds of Luce county, Michigan, in liber 24 on page 288, and also recorded elsewhere in the Upper Peninsula of Michigan, are held by me upon the terms and conditions and for the uses, trusts and benefits as follows:
 

 1st. That in the year 1916 and at about the time said deed was executed, I was connected with the organization of a company known as Cloverland Timber Company organized under the laws of the State of Michigan, of -which company I was elected the president and of which company H. H. Hamilton, of St. Paul, Minnesota, was chairman of the board, and George W. Preston, of the same city, was secretary, and one Glenn Gulliekson was vice-president.
 

 2nd. That on or about the date aforesaid an agreement was executed by the Upper Peninsula Land Company, Limited, the said Upper Michigan Land Company, the State Bank of Chicago, as trustee, and the said Cloverland Timber Company, all of said
 
 *450
 
 parties being interested in said premises, whereby Upper Michigan Land Company secured a deed of the said premises bearing the same date as the deed to me. That the said Cloverland Timber Company agreed to purchase certain premises, of which those contained in said deed to me were a part, from the said Upper Michigan Land Company and to pay therefor the sum of $329,000 and that in order to pay a portion thereof the premises described in said deed were conveyed to me for the purpose of securing a loan thereon for the said Cloverland Timber Company in the sum of $100,000 from one Ralph O. Olson and that said lands described in said deed were conveyed to me solely for the purpose of borrowing money from the said Ralph O. Olson or the First National Bank of St. Cloud, of which he was then an officer, which said money was, in fact, borrowed by me on the security of said land and paid by me to the Upper Michigan Land Company on account of the purchase price thereof by the Cloverland Timber Company. That I had no personal interest in said premises and that said premises were, in fact, the property of the Cloverland Timber Company and said conveyance was made to me with the distinct understanding that the premises therein described were the lands of the Cloverland Timber Company and deeded to me solely for the purpose of borrowing said sum of $100,000.
 

 3rd. I do further state and declare that I hold title to said premises solely for the uses, purposes and trusts aforesaid' and for the benefit of the' said Cloverland Timber Company and not for my own use or benefit. That the only lands described in said deed to me hereinbefore mentioned in which I had any personal interest are certain lands therein described in township
 
 42
 
 north of range 12 west, Mackinac County, Michigan, for which I held a personal contract and which were conveyed to me as my own property.